**AMERICAN LIBRARY ASSOCIATION, et al., Appellees,**

v.

**Janet RENO, Attorney General of the United States; Department of Justice, Appellants.**

**No. 92–5271.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 9, 1993.

Decided Sept. 20, 1994.

Jacob M. Lewis, Atty., U.S. Dept. of Justice, with whom Eric H. Holder, Jr., U.S. Atty., and Barbara L. Herwig, Atty., U.S. Dept. of Justice, Washington, DC, were on the briefs, for appellants. Vincent M. Garvey and Thomas H. Peebles, Attys., U.S. Dept. of Justice, Washington, DC, entered appearances for appellants.

David W. Ogden, with whom Bruce J. Ennis, Ann M. Kappler, and Maureen F. Del Duca, Washington, DC, were on the brief, for appellees.

Len L. Munsil, Phoenix, AZ, was on the brief for amici curiae Nat. Family Legal Foundation. Marjorie Heins, New York City, Arthur B. Spitzer, John I. Stewart, Jr., and William D. Wallace, Washington, DC, were on the brief for *amici curiae* American Civil Liberties Union, et al.

Before BUCKLEY and WILLIAMS, Circuit Judges, and JOHN W. REYNOLDS,* District Judge for the Eastern District of Wisconsin.

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

Opinion for the court filed by Circuit Judge BUCKLEY.

Dissenting opinion filed by District Judge JOHN W. REYNOLDS.

BUCKLEY, Circuit Judge:

The district court has sustained appellees'[**] First Amendment challenge to the Child Protection and Obscenity Enforcement Act of 1988, as amended, and its implementing regulations. These require producers of materials depicting sexually explicit acts to maintain certain records documenting the names and ages of the persons portrayed and to attach statements to the materials indicating where the records are located. Because we find the challenged provisions to be content neutral and because, in most applications, they meet the intermediate level of scrutiny established by the Supreme Court in such cases, we affirm in part and reverse in part.

## I. BACKGROUND

### A. Legal Framework

#### 1. *The statute*

The Child Protection and Obscenity Enforcement Act of 1988, Pub.L. No. 100–690, 102 Stat. 4181, 4485–4503 (1988) ("1988 Act" or "Act"), as amended by the Child Protection Restoration and Penalties Enhancement Act of 1990, Pub.L. No. 101–647, 104 Stat. 4789, 4816–17 (1990) ("1990 amendments"), imposes record-keeping and disclosure requirements on the producers of certain sexually explicit materials. This legislation represents the most recent of a series of laws, beginning with the Protection of Children Against Sexual Exploitation Act of 1977, Pub.L. No. 95–225, 92 Stat. 7 (1978) ("1977 Act"), that are designed to combat the sexual exploitation of children. Among the offenses made criminal by the 1977 Act, as amended, are the production and knowing distribution of materials visually depicting minors en-

gaged in sexually explicit conduct. 18 U.S.C. §§ 2251(a), 2252(a)(2) (1988 & Supp. II 1990).

The 1988 Act was passed by Congress on the recommendation of the Attorney General's Commission on Pornography in order to address a problem that had hindered the prosecution of child pornography offenses. *See American Library Ass'n v. Barr,* 956 F.2d 1178, 1182 (D.C.Cir.1992) ("*ALA I*"). In particular, the Commission found that because producers tended to use performers who could pass for minors, distributors were able to avoid prosecution on a claim of ignorance of a child performer's true age while producers could assert that they had been deceived. *Id.* In order to address this problem, the 1988 Act required producers (as defined) of materials containing visual depictions of explicit sexual activity to determine the names and ages of the performers, maintain records of this information, and indicate on each copy of the material where those records are kept. 18 U.S.C. § 2257 (1988 & Supp. II 1990). Soon thereafter, several parties challenged the constitutionality of these provisions. The district court ruled, *inter alia,* that significant parts of section 2257 violated the First Amendment. *American Library Ass'n v. Thornburgh,* 713 F.Supp. 469, 479 (D.D.C.1989). Following the filing of an appeal, Congress responded by adopting the 1990 amendments, which "significantly altered" the "scope and burden" of the section's original recordkeeping requirements. *ALA I,* 956 F.2d at 1186. Accordingly, we "vacate[d] the portion of the [district] court's judgment concerning the 1988 Act's recordkeeping provisions" as moot. *Id.* at 1187.

The Act provides that

[w]hoever produces any book, magazine, periodical, film, videotape, or other matter which contains one or more visual depictions made after November 1, 1990 of actual sexually explicit conduct ... shall create and maintain individually identifi-

[**] American Library Ass'n, Freedom to Read Foundation, American Booksellers Ass'n, Inc., American Booksellers Foundation for Free Expression, The American Society of Magazine Photographers, Council for Periodical Distributors Ass'ns, Inc., International Periodical Distributors Ass'n, Inc., National Ass'n of Artists' Organizations, National Campaign for Freedom of Expression, IVR Management Co., Inc., d/b/a The Independent Video Retailers Ass'n, Penthouse Int'l, Ltd., Hank Londoner Photography, Inc., Haaren Enterprises, Inc., d/b/a Suze Randall Photography.

able records pertaining to every performer portrayed in such a visual depiction.

18 U.S.C. § 2257(a). It defines "actual sexually explicit conduct" as "actual but not simulated conduct" involving (by reference to subsections 2256(2)(A)–(D)) sexual intercourse, bestiality, masturbation, and sadistic or masochistic abuse. *Id.* § 2257(h)(1) (Supp. II 1990). Producers of materials covered by the Act must, for every performer,

(1) ascertain, by examination of an identification document containing such information, the performer's name and date of birth, and require the performer to provide such other indicia of his or her identity as may be prescribed by regulations;

(2) ascertain any name, other than the performer's present and correct name, ever used by the performer including maiden name, alias, nickname, stage, or professional name; and

(3) record in the records required by subsection (a) the information required by paragraphs (1) and (2) of this subsection and such other identifying information as may be prescribed by regulation.

*Id.* § 2257(b). Such records generally must be kept at the producer's place of business. *Id.* § 2257(c). Moreover, "a statement describing where the records ... may be located" must be affixed to the materials covered by the Act ("disclosure requirement"). *Id.* § 2257(e)(1). If the producer is an "organization," this statement must include "the name, title, and business address of the individual employed by such organization responsible for maintaining the records...." *Id.* § 2257(e)(2).

### 2. *The regulations*

The Attorney General issued regulations implementing this statutory framework on April 24, 1992. *See* 57 Fed.Reg. 15017, 15021 (1992) ("Final Rule"). These divide producers into two categories, "primary" and "secondary." 28 C.F.R. § 75.1(c) (1993). A primary producer is one who "actually films, videotapes, or photographs a visual depiction of actual sexually explicit conduct," *id.* § 75.-1(c)(1), while a secondary producer "produces, assembles, manufactures, publishes, duplicates, reproduces, or reissues" materials containing such depictions that are "intended for commercial distribution." *Id.* § 75.-1(c)(2). The same person, of course, may be both a primary and a secondary producer. *Id.* § 75.1(c)(3).

The regulations require that all producers maintain records that contain "[t]he legal name and date of birth of each performer, obtained by the producer's examination of an identification document...." *Id.* § 75.-2(a)(1). Those records must include a "legible copy of the identification document examined," *id.*, as well as "[a]ny name, other than each performer's legal name, ever used by the performer, including the performer's maiden name, alias, nickname, stage name, or professional name." *Id.* § 75.2(a)(2). Moreover, these records must be so organized as to permit the retrieval of information based on the legal and alternative names of the performers and "according to the title, number, or other similar identifier of each book, magazine, periodical, film, videotape, or other matter." *Id.* § 75.3. A secondary producer, however, is permitted to "maintain records by accepting from the primary producer ... copies of the records" as long as he keeps the "name and address of the primary producer." *Id.* § 75.2(b). Both classes of producers must make these records available "for inspection at all reasonable times," *id.* § 75.5, at their places of business for "as long as the producer remains in business" and "five years thereafter." *Id.* § 75.4.

Finally, the regulations address the disclosure requirement. They stipulate that the statements that are to be affixed to materials containing depictions of actual sexually explicit conduct must contain the "title," "identifying number or similar identifier" of the work, the "date of production, manufacture, publication, duplication, reproduction, or reissuance of the matter," and "[a] street address at which the records ... may be made available." 28 C.F.R. § 75.6(a). Organizations must also include in the statement "the name, title, and business address of the individual ... responsible for maintaining the records...." *Id.* § 75.6(b). The statements are to be "prominently displayed" in or on the materials, *id.* § 75.8, and "must be accurate as of the date on which the [material] is

sold, distributed, redistributed, or rere-leased." *Id.* § 75.6(c).

Information obtained from the records that producers are required to create or maintain may not, "directly or indirectly, be used as evidence against any person with respect to any violation of law" other than "in a prose-cution or other action for a violation of [sec-tion 2257] or ... any applicable provision of the law with respect to the furnishing of false information." 18 U.S.C. § 2257(d)(1) & (2). A producer is subject to prosecution under section 2257 for, among other things, the failure to create or maintain the required records and the knowing sale or "transfer, or offer for sale or transfer" of materials depict-ing actual sexually explicit conduct that do not contain the requisite statement disclosing the location of the records. *Id.* § 2257(f). Such violations are felonies: The maximum punishment for a first-time offender is two years of imprisonment and a fine; repeat offenders are subject to two to five years of imprisonment and a fine. *Id.* § 2257(i).

### B. Procedural History

Appellees include trade associations and corporations that are engaged in, or whose members are engaged in, the "produc[tion] and distribut[ion of] visual images containing actual sexual conduct of *adults*." *American Library Ass'n v. Barr,* 794 F.Supp. 412, 416 n. 4 (D.D.C.1992) ("*ALA II* ") (emphasis in original). In presenting their case to the district court, they argued that, notwith-standing the 1990 amendments, the Act's rec-ord-keeping and disclosure requirements continue to place an unconstitutional burden on lawful speech and therefore violate the First Amendment. The district court agreed, finding that the requirements were not "narrowly tailored to achieve a significant legislative goal." *Id.* at 418. The court ex-plained that

> the Act's primary flaw is that it applies to all depictions of actual sexually explicit conduct regardless of the age or even the apparent age of the model. Thus, the Act sweeps equally under its scope visual de-pictions of people who are sixteen, twenty-five, forty and sixty years old. While the government has every right to regulate—

or even ban—such depictions of underaged persons, it does not even bear a rational relationship to its goal to regulate equally all sexually explicit art regardless of the model's age, even when that age is known.

*Id.* at 417. The court also concluded that the Act's "severe" penalties and "extremely bur-densome" record-keeping requirements would impose "substantial burdens" that would "stifle much of Plaintiff's [sic] protect-ed expression." *Id.* at 418. Accordingly, the court "enjoin[ed] enforcement of [the] Act as it applies to records that must be kept per-taining to images of adult models," and ruled that the "Act may not be applied to [appel-lees] and other producers of such images who use due diligence to satisfy themselves that the subjects in these images are over 18 years of age." *Id.* at 419. It found the Act constitutional, however, "as applied to images of models under 18 years of age." *Id.*

## II. DISCUSSION

 We dismiss at the outset the Govern-ment's claim that appellees have brought a pre-enforcement facial challenge to the Act and must therefore establish that the statute is "unconstitutional in every conceivable ap-plication" or that it is "substantially over-broad," citing *City Council v. Taxpayers for Vincent,* 466 U.S. 789, 796, 104 S.Ct. 2118, 2124, 80 L.Ed.2d 772 (1984), and *New York v. Ferber,* 458 U.S. 747, 771, 102 S.Ct. 3348, 3362, 73 L.Ed.2d 1113 (1982). Appellees re-spond that theirs is not a facial challenge; they assert that the Act is unconstitutional as it applies to them. *Cf. Broadrick v. Okla-homa,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973) (noting that litigants bring a facial challenge where they attack "a statute not because their own rights of free expression are violated, but because ... the statute's very existence may cause others not before the court to refrain from constitution-ally protected speech"). To be sure, the Act has never been enforced. It nonetheless im-poses present-day burdens on several of the appellees as the producers of sexually explic-it materials. Should we credit their chal-lenge, appellees presently are suffering inju-ry in violation of the First Amendment. As the district court noted, "[n]o jury conviction

or prosecutorial discretion can relieve them of the immediate burdens which compliance will bring." *ALA II,* 794 F.Supp. at 416 n. 4.

## A. Standard of Review

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. The Supreme Court has ruled that the production and distribution of pictures of adults engaged in sexual acts is protected by the First Amendment so long as they are not obscene. *See Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973); *see also Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46, 79, 109 S.Ct. 916, 936, 103 L.Ed.2d 34 (1989) (noting existence of "line between protected pornographic speech and obscenity"). Under the Act and its implementing regulations, Congress has imposed certain burdens on persons who produce such materials for commercial distribution in interstate or foreign commerce. The question is whether these burdens unconstitutionally restrict the producers' protected speech.

■ To answer that question, we must first determine the level of scrutiny that is applicable to the Act's record-keeping and disclosure requirements. *Turner Broadcasting System, Inc. v. FCC,* —— U.S. ——, ——, 114 S.Ct. 2445, 2456, 129 L.Ed.2d 497 (1994) ("because not every interference with speech triggers the same degree of scrutiny under the First Amendment, we must decide at the outset the level of scrutiny applicable"). "[T]he appropriate level of scrutiny is initially tied to whether the statute distinguishes between prohibited and permitted speech on the basis of content." *Frisby v. Schultz,* 487 U.S. 474, 481, 108 S.Ct. 2495, 2501, 101 L.Ed.2d 420 (1988). If it does, the statute is subject to strict scrutiny. *Id.* "Content-based regulations are presumptively invalid," *R.A.V. v. City of St. Paul,* —— U.S. ——, ——, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992), and survive constitutional review only if they promote a "compelling interest" and employ "the least restrictive means to further the articulated interest." *Sable Communications of California, Inc. v. FCC,* 492

U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989).

In contrast, "regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2445 (citation omitted). Thus "content-neutral regulations that have an incidental effect on First Amendment rights will be upheld if they further an important or substantial governmental interest." *Walsh v. Brady,* 927 F.2d 1229, 1235 (D.C.Cir.1991) (internal quotation marks omitted).

As the Supreme Court has acknowledged, "[d]eciding whether a particular regulation is content-based or content-neutral is not always a simple task." *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2445. In order to determine whether a statute is content neutral,

> [t]he principal inquiry ..., in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. Government regulation of expressive activity is content neutral so long as it is *justified* without reference to the content of the regulated speech."

*Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (quoting, with emphasis, *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976) (citations omitted)). In the term just completed, the Supreme Court twice reemphasized the key role of the Government's purpose in determining whether a particular statute is content based or content neutral. *See Madsen v. Women's Health Center, Inc.,* —— U.S. ——, ——, 114 S.Ct. 2516, 2523, 129 L.Ed.2d 593 (1994) ("We thus look to the govern-

ment's purpose as the threshold consideration"); *Turner Broadcasting,* — U.S. at —, 114 S.Ct. at 2461 ("Congress' overriding objective in enacting [statute] was not to favor programming of a particular subject matter, viewpoint, or format, but rather to preserve access to free television programming for the 40 percent of Americans without cable.")

Two cases are directly relevant to our inquiry. The first is *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), where the Court upheld a law that prohibited the destruction of Selective Service registration certificates—draft cards. *O'Brien* noted that

> [t]his Court has held that when "speech" and "non-speech" elements are combined in the same course of conduct, a sufficiently important governmental interest in *regulating the nonspeech element* can justify incidental limitations on First Amendment freedoms.

*Id.* at 376, 88 S.Ct. at 1678–79 (emphasis added). In *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), the Court used analogous reasoning to conclude that a zoning ordinance barring "adult" (but not mainstream) movie theatres from locating within 1,000 feet of any residence, church, park, or school was a valid content-neutral time, place, and manner regulation. While acknowledging that "the ordinance treats theaters that specialize in adult films differently from other kinds of theaters," the Court concluded that it was "aimed not at the *content* of the films shown at 'adult motion picture theatres,' but rather at the *secondary effects* of such theaters on the surrounding community." *Id.* at 47, 106 S.Ct. at 929 (emphasis in original). The Court later explained its decision in *Renton* in this manner:

> So long as the justifications for regulation have nothing to do with content, *i.e.,* the desire to suppress crime has nothing to do with the actual films being shown inside adult movie theaters, we concluded that the regulation was properly analyzed as content neutral.

*Boos v. Barry,* 485 U.S. 312, 320, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988). In both *O'Brien* and *Renton,* the Court applied an intermediate level of scrutiny. *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679; *Renton,* 475 U.S. at 50, 106 S.Ct. at 930.

There can be no question but that Congress's sole purpose in adopting section 2257 was to address what the Attorney General's Commission on Pornography found to be an important deficiency in the existing child protection laws:

> Despite the umbrella protection provided by the Child Protection Act of 1984, loopholes remain that permit the continued exploitation of children. For example, experts and law enforcement officers have found it difficult to extend this protection because in many instances, ascertaining the real ages of adolescent performers is impossible. By viewing a visual depiction, how does one decide if the performer is fourteen or eighteen, seventeen or twenty-one?

1 Attorney General's Commission on Pornography, Final Report at 620 (1986) ("Final Report"). To address this problem, the Commission urged adoption of the record-keeping requirements that Congress incorporated in section 2257:

> The recommended legislation would require producers to obtain release forms from each performer with proof of age. The forms would be filed at a specified location listed in the opening or closing footage of a film, the inside cover of the magazine or standard locations in or on other material containing visual depictions.
>
> The name, official title and location of the responsible person or corporate agent supervising such records would also be listed to avoid use of corporate shields. The release forms should be available for inspection by any duly authorized law enforcement officer upon demand as a regulatory function for the limited purposes of determining consent and proof of age....
>
> A producer should be required to maintain these records for a minimum period of five years.... This legislation would not only protect minors from abuse, but it would also place the burden of ensuring this protection was implemented squarely on the producers of the materials. The

proposed legislation would serve a record keeping purpose comparable to that found in environmental and similar statutes.

*Id.* at 621–22 (footnotes omitted). The Commission also recommended that "[t]he record-keeping obligation . . . be imposed on whole-salers, retailers, distributors, producers and any one [sic] engaged in the sale or trade of sexually explicit material" in order to "afford protection to minors through every level of the pornography industry." *Id.* at 619.

■ From the above, we conclude that the congressional purposes in enacting the challenged provisions are threefold: (a) to prevent the exploitation of children by requiring those responsible for photographing or video-taping sexually explicit acts (those defined in the regulations as "primary producers") to secure proof of the performer's age and to keep a record of the same as evidence of their compliance, (b) to deprive child pornographers of access to commercial markets by requiring secondary producers to inspect (and keep a record of) the primary producers' proof that the persons depicted were adults at the time they were photographed or videotaped, and (c) to establish a system by which a law enforcement officer in possession of materials containing depictions of sexually explicit acts will be able to identify the performers and verify compliance with the Act.

■ Appellees argue, nevertheless, that whatever the purposes of the recordkeeping and disclosure requirements, the Act must be deemed content based, and therefore subject to the strict scrutiny standard, because its requirements are triggered by speech of a particular content. Cases like *Renton* make clear, however, that a "valid basis for according differential treatment to even a content-defined subclass of proscribable speech [exists when] the subclass happens to be associated with particular 'secondary effects' of the speech. . . ." *R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2546. Our analysis here thus focuses upon whether the Act is "*justified* without reference to the content of the . . . speech." *Id.* (quoting *Renton,* 475 U.S. at 48, 106 S.Ct. at 929; emphasis in original). Here, it is clear that Congress enacted the Act not to regulate the content of sexually explicit materials, but to protect children by deterring

the production and distribution of child pornography.

That conclusion is reinforced by "[t]he design and operation of the challenged provisions." *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2461. Section 2257 does not ban any kind of sexually explicit materials; rather, it imposes certain requirements on those who produce them. In this respect, the Act is comparable to the zoning ordinance at issue in *Renton,* which the Court found to be content neutral. That ordinance "[did] not ban adult theaters altogether, but merely provide[d] that such theaters may not be located within [certain areas]." 475 U.S. at 46, 106 S.Ct. at 928. The Court found that the ordinance "by its terms [was] designed to prevent crime, protect the city's retail trade, [and] maintain property values . . ., not to suppress the expression of unpopular views." *Id.* at 48, 106 S.Ct. at 929 (internal quotation marks omitted). The Act's record-keeping and disclosure requirements do not impinge on the content of the materials; rather, they are designed to deter the exploitation of children and to facilitate the identification of performers depicted in sexually explicit materials. *Compare Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2468 (describing two state tax laws subjected to strict scrutiny because "[a]lthough there was no evidence that an illicit governmental motive was behind either of the taxes, both were structured in a manner that raised suspicions that their objective was, in fact, the suppression of certain ideas"). In sum, while the *Renton* ordinance and section 2257 may impose certain obligations on the speakers, they place no restrictions on the speech itself.

Appellees assert, however, that the Act must be deemed content based because it applies to a category of persons that is defined by the content of the materials they produce. But again, the fact that those covered by the Act are content defined does not affect the content of the speech they are engaged in producing and distributing. In *Renton,* the Supreme Court concluded that the zoning ordinance at issue was content neutral even though it applied only to a content-defined class of movie theaters. 475 U.S. at 47–48, 106 S.Ct. at 928–29. There,

the ordinance addressed collateral harms unrelated to whatever thoughts the theaters' films might communicate to their viewers. *Id.* at 48–49, 106 S.Ct. at 929–30. Similarly, section 2257 applies to speech of a particular content not because of any concern over the thoughts it might convey, but because the evil the law was designed to address—the use of underage performers—has its locus in the speech's production. *Cf. R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2546 (a "valid basis for according differential treatment to even a content-defined subclass of proscribable speech [exists when] the subclass happens to be associated with particular 'secondary effects' of the speech so that the regulation is '*justified* without reference to the content of the ... speech.'" (quoting *Renton,* 475 U.S. at 48, 106 S.Ct. at 929; emphasis in original)). The Supreme Court has cautioned that "[i]t would be error to conclude ... that the First Amendment mandates strict scrutiny for any speech regulation that applies to one medium (or a subset thereof) but not others." *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2468. "[T]he fact that a law singles out a certain medium ... 'is insufficient by itself to raise First Amendment concerns.'" *Id.* (quoting *Leathers v. Medlock,* 499 U.S. 439, 452, 111 S.Ct. 1438, 1446, 113 L.Ed.2d 494 (1991)).

Finally, appellees argue that section 2257 is content based because the record-keeping and disclosure provisions are so burdensome that they will chill at least some constitutionally protected speech, citing the Supreme Court's decisions in *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 658, 110 S.Ct. 1391, 1396–97, 108 L.Ed.2d 652 (1990); *FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 254, 256, 107 S.Ct. 616, 625–26, 626–27, 93 L.Ed.2d 539 (1986); and *Buckley v. Valeo,* 424 U.S. 1, 66, 96 S.Ct. 612, 657, 46 L.Ed.2d 659 (1976). Such requirements, to be sure, may "create a disincentive ... to engage in [protected] speech." *Massachusetts Citizens for Life,* 479 U.S. at 254, 107 S.Ct. at 626. But the "mere assertion of some possible self-censorship resulting from a statute is not enough to render [a] law unconstitutional...." *Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46, 60, 109 S.Ct. 916, 926, 103 L.Ed.2d 34 (1989). In any event, these cases are readily distinguishable. All three deal with various issues of disclosure requirements and contribution restrictions in the context of political speech. But more fundamentally, in none of them does the Court discern a legislative purpose wholly unrelated to the suppression of speech. To the contrary, all three cases involve direct restraints on speech-related expenditures. *See Austin,* 494 U.S. at 655–56, 110 S.Ct. at 1395–96 (state statute barring corporations from making contributions and independent expenditures in connection with state candidate elections); *Massachusetts Citizens for Life,* 479 U.S. at 241, 107 S.Ct. at 619 (federal provision proscribing expenditures from corporation's treasury funds in connection with an election); *Buckley,* 424 U.S. at 39, 96 S.Ct. at 644 (federal provision imposing limitations on expenditures "relative to a clearly identified candidate"). The Act, by contrast, places no comparable restraints on speech.

For all of these reasons, we conclude that the requirements imposed by the Act are addressed to legitimate governmental concerns that are unrelated to speech. Congress passed the Act in order to prevent the use of underage performers in the production of sexually explicit materials. The First Amendment affords no protection to such conduct. *New York v. Ferber,* 458 U.S. 747, 763–66, 102 S.Ct. 3348, 3357–59, 73 L.Ed.2d 1113 (1982). Hence, the Act satisfies the content-neutral formulation established in *O'Brien:* Producers of sexually explicit materials engage in conduct that potentially contains both protected (sexually explicit depictions of adult performers) and unprotected (sexually explicit depictions of underage performers) speech, and the Act permissibly targets the latter. *Accord Turner Broadcasting,* —— U.S. at ——, ——, 114 S.Ct. at 2464, 2469 (citing *O'Brien* to apply intermediate scrutiny to provisions requiring cable companies to broadcast local programming because Congress's intent was to ensure that free local broadcast television remained available to those without cable).

■ While the effects of the Act's record-keeping requirements on speech are not insubstantial, they are incidental and largely

unavoidable. The Act will pass constitutional muster

> if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679. Later decisions make clear that once a regulation is deemed content neutral, this inquiry reduces to whether the requirements "are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." *Ward,* 491 U.S. at 791, 109 S.Ct. at 2753 (internal quotation marks omitted); *see Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 298 & n. 8, 104 S.Ct. 3065, 3071 & n. 8, 82 L.Ed.2d 221 (1984) (equating the *O'Brien* test with "the standard applied to time, place, or manner restrictions"). We turn now to this task.

**B. Application**

*1. In general*

Appellees concede, as they must, that the Government has a significant—indeed compelling—interest in the prevention of child pornography. *See Ferber,* 458 U.S. at 756–57, 102 S.Ct. at 3354 (upholding statute barring promotion of sexual performances by children under 16 and noting that "a State's interest in safeguarding the physical and psychological well-being of a minor is compelling") (internal quotation marks omitted). Nor do they deny that the Act leaves open ample avenues for the communication of sexually explicit materials. Indeed, the Act, by its terms, bans no form of expression. Appellees' sole (and vigorously argued) complaint is that the Act's record-keeping requirements are not narrowly tailored to the prevention of child pornography.

■ In addressing this argument, we are reminded that a narrowly tailored regulation "need not be the least restrictive or least intrusive means" of serving the government's content-neutral interests. *Ward,* 491 U.S. at

798, 109 S.Ct. at 2757; *accord Board of Trustees of the State Univ. of New York v. Fox,* 492 U.S. 469, 478, 109 S.Ct. 3028, 3033–34, 106 L.Ed.2d 388 (1989) ("to be 'narrowly tailored' . . . we have not insisted that there be no conceivable alternative, but only that the regulation not burden substantially more speech than is necessary to further the government's legitimate interests. And we have been loath to second-guess the Government's judgment to that effect.") (citations and internal quotation marks deleted); *Clark,* 468 U.S. at 299, 104 S.Ct. at 3072 (rejecting the "view that the challenged regulation is unnecessary, and hence invalid, because there are less speech-restrictive alternatives that could have satisfied the Government interest"); *Regan v. Time, Inc.,* 468 U.S. 641, 657, 104 S.Ct. 3262, 3271, 82 L.Ed.2d 487 (1984) (plurality opinion) ("The less-restrictive-alternative analysis . . . has never been a part of the inquiry into the validity of a time, place, and manner regulation"). But "[a] regulation is not narrowly tailored—even under the more lenient tailoring standards applied in *Ward* and *Renton*—where . . . a substantial portion of the burden on speech does not serve to advance [the State's content-neutral] goals." *Simon & Schuster, Inc. v. New York Crime Victims Bd.,* 502 U.S. 105, —— —— n. \*\*, 112 S.Ct. 501, 511–12 n. \*\*, 116 L.Ed.2d 476 (1991) (internal quotation marks and citations omitted). We conclude that a regulation will meet the Supreme Court's "narrowly tailored" requirement if a substantial portion of the burden it imposes furthers the Government's interest, even though a less intrusive alternative might also exist.

■ Our inquiry, then, is whether the Act's record-keeping requirements are narrowly tailored to the prevention of child pornography. To begin, it seems obvious to us that, as a general matter, the requirements of section 2257 advance the abatement of child pornography in fundamental ways. By requiring that primary producers inspect and make a record of documentary evidence of the performers' ages and, in turn, that secondary producers inspect and retain a copy of the same, section 2257 forwards three goals: It ensures that primary producers

actually confirm that a prospective performer is of age; it deters children from attempting to pass as adults; and, most important, it creates the only mechanism by which secondary producers (who by definition have no contact with performers) can be required to verify the ages of the individuals pictured in the materials they will be producing. Absent the primary producers' records, they can always plead honest mistake; and this is precisely the problem that prompted the Commission to recommend passage of the Act:

> The Commission found that producers, catering to the child pornography market, often used very young-looking performers in order to give the viewer the impression they were minors. Except in the most obvious instances, no one could be certain whether the performers really were under the age of eighteen. That not only hindered prosecution of child pornography offenses *but also provided an excuse to those in the distribution chain, who could profess ignorance that they were actually dealing in sexual materials involving children.* Producers too could escape the laws' sanction by claiming they were misled about the performer's age or did not know the performer's true identity.

*ALA I,* 956 F.2d at 1182 (internal citations omitted; emphasis added). Such defenses, of course, would be unavailing in a prosecution or other action for failure to create or maintain the records required by the Act. *See* 18 U.S.C.A. § 2257(f)(1). Primary producers of sexually explicit materials are required to obtain information of the performer's age and identity, 28 C.F.R. § 75.2(a), and secondary producers are prohibited from reproducing such materials without obtaining this information from the primary producers. *Id.* §§ 75.1(c)(2), 75.2(b).

Appellees object that the Act will do little to encourage primary producers to secure documentary confirmation of their subjects' ages because virtually all those engaged in providing sexually explicit materials for commercial markets already require such evidence. They assert, moreover, that as a practical matter a "reasonable mistake" defense is not available in child pornography cases. Although they acknowledge that the

Ninth Circuit has held that the 1977 Act as amended (current version at 18 U.S.C. § 2251(a) (Supp. II 1990)) is "subject to a reasonable mistake of age defense," *United States v. U.S. Dist. Court for the Cent. Dist. of Cal.,* 858 F.2d 534, 543 (9th Cir.1988), they argue that that defense may only be used by those who have "diligently investigated" the performers' age, and that such an investigation requires the viewing of identification documents. Even assuming that these assertions are correct, however, the record-keeping obligations imposed on primary producers remain elements of the statutory scheme that are critical to ensuring that secondary producers deny child pornographers access to their markets.

In light of the above, we cannot agree with appellees that the Act serves no meaningful purpose given the existence of other criminal laws prohibiting child pornography. While it is true that we observed, in *ALA I,* that "it is hard to imagine anyone who would willingly risk 10 years of their life to publish [child pornography], but would refrain if they also would be risking" confiscation of property for not abiding by the 1988 Act, 956 F.2d at 1191, that remark was addressed to the efficacy of adding use forfeiture to the existing penalties. Here we deal with a law imposing new requirements that have a significant independent enforcement purpose. After fourteen months of investigations, the Commission on Pornography recommended that "Congress should enact a statute requiring the producers ... of sexually explicit visual depictions to maintain records containing consent forms and proof of performers' ages," precisely because of "gaps" and "loopholes" in existing law that facilitated the exploitation of children. Final Report at 618–20. The Act accomplishes these ends by ensuring that honest but careless producers secure documentary evidence of a performer's age and by denying unscrupulous producers the defense that they reasonably believed the performer to be of age.

We also reject appellees' contention that the Act is substantially overinclusive. Based on their contention that little commercially produced child pornography exists, they maintain that the Act applies almost entirely

to constitutionally protected depictions of adults. This argument mistakenly assumes that burdening such materials will not further the Government's interest in preventing child pornography. To the contrary, the statutory scheme depends upon requiring producers to identify and maintain records of *every* performer who appears in their sexually explicit materials. The entire point of the Act is to prevent subjective determinations of age by implementing a uniform procedure that applies to all performers. *Compare, e.g.,* 8 U.S.C. § 1324a(b) (1988 & Supp. III 1991) (requiring employers to verify and maintain proof of verification of every employee's right to work in the United States).

Absent documentation, such determinations are not easy. Where pornographic materials are concerned, "[p]erhaps the single most common feature of models is their relative, and in the vast majority of cases, absolute youth," Final Report at 855, with most female models appearing to have "[begun] their careers in their late teens." Final Report at 855. As the Commission points out, "[b]y viewing a visual depiction, how does one decide if the performer is fourteen or eighteen, seventeen or twenty-one?" *Id.* at 620. The Government must be allowed to paint with a reasonably broad brush if it is to cover depictions of all performers who might conceivably have been minors at the time they were photographed or videotaped. We agree with appellees' suggestion that certain applications of the record-keeping requirements may well exceed constitutional bounds, an illustrated sex manual for the elderly being an obvious example. They fail to present us, however, with the concrete facts that would enable us to test the limits of the Act. *See Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 556, 105 S.Ct. 1005, 1020, 83 L.Ed.2d 1016 (1985) ("These cases do not require us to identify or define what affirmative limits" the Constitution may impose.) Those are best determined in case-by-case tests.

Appellees also argue that the Act must be found unconstitutional on the basis of *Simon & Schuster, Inc. v. New York Crime Victims Bd.,* 502 U.S. 105, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). The statute at issue in that case required that any money earned by a criminal from a book describing his crime be paid into an escrow fund for the benefit of any victim who secured a judgment against him. Applying strict scrutiny, the Court found that "the State has a compelling interest in ensuring that victims of crime are compensated by those who harm them," *id.* at ——, 112 S.Ct. at 509, but concluded that the law was "significantly overinclusive" because it applied to (and thus burdened) a large number of protected works in the process. *Id.* at ——, 112 S.Ct. at 511. The Court stated in dicta that the law was "so overinclusive" that it would fail even were it content neutral. *Id.* at —— – —— n. **, 112 S.Ct. at 511–12 n.**.

Appellees maintain that because the Act principally applies to adult performers, it mostly burdens protected speech and is void under *Simon & Schuster.* We disagree. In that case, the challenged law was found to be overbroad because it reached "a wide range of literature that does not enable a criminal to profit from his crime while a victim remains uncompensated" and because the statute was so worded that it could apply to "any author who admits in his work to having committed a crime, whether or not the author was ever actually accused or convicted." *Id.* at ——, 112 S.Ct. at 511. Moreover, while the stated purpose of the law was to escrow the author's earnings for the benefit of victims, it left untouched "any of the criminal's other assets." *Id.* at ——, 112 S.Ct. at 510. The Act, by contrast, burdens only that protected speech necessary to advance the Government's interest in preventing child pornography. Unlike the law in *Simon & Schuster,* it is essential to Congress's design that the Act impose its recordkeeping requirements on all performers who appear in sexually explicit materials.

### 2. *Objections to specific applications and provisions of the Act*

Here, as elsewhere, the devil lies in the details. Appellees challenge a host of specific requirements and applications of the Act and its implementing regulations. We address those that merit discussion, beginning

with challenges to the application of the record-keeping provisions.

### a. Record-keeping requirements

■ The record-keeping required of producers can hardly be considered onerous. Such records are routinely required to facilitate the enforcement of our immigration, labor, and tax laws. *See, e.g.,* 8 U.S.C. § 1324a(b) (employers must verify identities of employees and maintain proof of verification); 29 C.F.R. § 516.2(a)(3) (1993) (employers must, *inter alia,* verify their employees' birthdates); 26 C.F.R. § 31.6001–2(a)(1)(i) (1993) (employers must maintain records of employees' names and addresses). Appellees maintain, nevertheless, that the Act's record-keeping requirements impose an impermissible burden on secondary producers.

It should be noted at the outset that while secondary producers must maintain records of the ages and identities of the performers depicted in their materials, they

> may satisfy the[se] requirements . . . by accepting from the primary producer . . . copies of [the primary producer's] records . . . [and by keeping records of] the name and address of the primary producer from whom he received copies of the records.

28 C.F.R. § 75.2(b). The Justice Department interprets this provision as enabling secondary producers not in privity with the primary producer to rely on the records provided them by the immediately preceding secondary producer, and so advised the district court. *See* Reply Brief for Appellant at 9.

Contrary to what appellees suggest, the secondary producers' records serve important ends. They confirm the secondary producers' compliance with the Act and provide what is likely to be a more reliable depository of the information identifying and establishing the ages of the persons depicted. The photographer who sells a picture to a magazine may disappear three months later, and his records with him. The magazine, on the other hand, is apt to remain in business. Furthermore, because a given issue of a magazine or book may contain pictures of performers taken by several photographers, it serves the interests of law enforcement

efficiency to be able to verify their ages at a single location. Finally, the requirements imposed on secondary producers serve the Government's interests by denying their commercial markets to child pornographers.

■ Appellees assert, nonetheless, that specific features of the record-keeping requirements unacceptably burden speech. They begin with the regulatory mandate that "[s]uch records . . . be maintained as long as the producer remains in business" and "for five years thereafter." 28 C.F.R. § 75.4. The Government's need to be able to identify performers and verify conformance with the Act is not dependent on the producer remaining in business. Therefore, the section's requirement that the records remain available for a minimum period of five years, whether or not the producer continues in existence, appears reasonable. The obligation imposed by the regulation, however, is open ended. The Government has offered no reason why the containment of child pornography requires the maintenance of these records indefinitely, and we can think of none. We therefore set aside section 75.4's requirement that the records "be maintained as long as the producer remains in business." Pending its replacement by a provision more rationally tailored to actual law enforcement needs, we will accept a period of five years as reasonable. We do so because it conforms with both the five-year statute of limitations applicable to the Act, 18 U.S.C. § 3282 (1988), and the minimum period recommended by the Pornography Commission. Final Report at 621.

■ Appellees also challenge the Act's requirement that producers "ascertain any name . . . ever used by the performer," 18 U.S.C. § 2257(b)(2), and the regulation's requirement that their records be cross-referenced and retrievable as to

> [a]ll name(s) of each performer, including any alias, maiden name, nickname, stage name or professional name of the performer; and according to the title, number, or other similar identifier of each book, magazine, periodical, film, videotape, or other matter.

28 C.F.R. § 75.3. They maintain that these provisions are not only onerous (the first being virtually impossible to satisfy—short of employing a detective ·gency), but do nothing to deter the production of child pornography. The Government, however, interprets section 2257(b)(2) as merely requiring that producers record the aliases and other names provided by the performer in response to a request, citing the President's message transmitting the 1988 Act to Congress. *See* H.R. Doc. No. 100–129, 100th Cong., 1st Sess. 65 (1987) ("This requirement is satisfied if the producer asks the performer for the information.").

So interpreted, the requirement that the primary producer record other names used by a performer imposes a nominal burden at best. We find this appropriate to the protection of children because it enables enforcement officials to detect forged documentation. To illustrate, if it is determined that a particular woman had been pictured using aliases in 1990 and 1991 and using her own name in 1992, and if the documents in the records indicate an age of 18 on each occasion, it may be inferred that at least two of them are forged and that she was likely to be underage on the first two occasions. The cross-referencing of the records allows enforcement officials to locate the documents for comparison.

### b. Labeling requirements

■ We now address appellees' concerns over the statements that both primary and secondary producers must affix to materials depicting sexually explicit conduct. 18 U.S.C. § 2257(e). The regulations provide, in relevant part:

(a) Every statement shall contain:

(1) The title of the book, magazine, periodical, film, or videotape, or other matter ... or, if there is no title, an identifying number or similar identifier ...;

(2) The date of production, manufacture, publication, duplication, reproduction, or reissuance of the matter; and

(3) A street address at which the records required by this part may be made available. ...

. . . . .

(c) The information contained in the statement must be accurate as of the date on which the book, magazine, periodical, film, videotape, or other matter is sold, distributed, redistributed, or rereleased.

28 C.F.R. § 75.6(a)–(c).

As a general matter, we find permissible the requirement that producers affix statements to sexually explicit materials that identify where proof of the depicted performers' ages may be found. Requiring the creation of records is of little avail if they cannot be readily located. We do not find it overly burdensome to require that such statements be printed near the beginning of a book or magazine, or placed at the beginning or end of a film or videotape. *See* 28 C.F.R. § 75.8. Appellees nevertheless challenge, as both overbroad and unnecessary to the purposes of the Act, the requirement that the statement be accurate "as of the date on which [the sexually explicit material] is sold, distributed, redistributed, or rereleased." 28 C.F.R. § 75.6(c).

On its face, the regulations' updating requirement would reach wholesale and retail transactions that lie entirely beyond the scope of the Act. *See id.* at § 75.1(d) (defining "sell, distribute, redistribute, and rerelease" to include "commercial distribution of a book, magazine, periodical, film, videotape, or other matter" covered by the Act). The Act, however, imposes the obligation to keep records and affix statements only on those who "produce[ ] any book, magazine, periodical, film, videotape, or other matter which ... contains ... depictions ... of actual sexually explicit conduct," 18 U.S.C. § 2257(a)(1); and it defines "produces" to mean "produce, manufacture, or publish any [such material] ... and includes the duplication, reproduction, or reissuing of any such matter." *Id.* § 2257(h)(3). Because the Act does not apply to those solely engaged in the sale of these items, its requirements may not be imposed on them. The Act cannot be read to require a magazine vendor, for example, to revise the statement in a pornographic

periodical "as of the date on which [it] is sold" to a consumer. We find, however, that it is entirely appropriate to require that the information contained in the statement be accurate as of the date that such materials are published, produced, republished, or reproduced (in the sense of "produced anew"); and we uphold section 75.6(c) insofar as it is so applied. *Cf.* Final Rule, 57 Fed.Reg. at 15020 ("the location statement must be current at the time of republication or reproduction").

■ Another objection concerns the application of the disclosure requirement to photographs exhibited in an art gallery. Because section 75.8 requires that such statements "be prominently displayed," appellees assume that the statement would have to be affixed to the front of the photograph, thereby compromising its artistic integrity. This is sheer speculation. We suggest there may be other ways in which the purposes of the Act may be achieved without interfering with the aesthetics of photographs portraying sexual acts—such as affixing the statements to the backs of the pictures. Be that as it may, this question, and others like it, cannot be decided on the basis of hypotheticals. "We possess no factual record of an actual or imminent application of [the Act (or the disclosure requirement) to photographs exhibited in an art gallery] sufficient to present the constitutional issues in clean-cut and concrete form." *Renne v. Geary*, 501 U.S. 312, 321–22, 111 S.Ct. 2331, 2339, 115 L.Ed.2d 288 (1991).

*c. Other challenges*

■ We are left with four "as applied" objections that warrant discussion, two of them advanced by the district court. The first objection involves "appropriationist artists," photographers who create distinct works that incorporate photographs taken by others—typically, without permission. The record confirms that appropriationists constitute a recognized school of art photography. Appellees assume that appropriationists are primary producers and assert that this imposes on them the impossible task of having to identify and maintain records of performers who appear in pictures taken by other

photographers whom they may not be able to locate and whose cooperation (if they are located) can hardly be guaranteed. We disagree with their premise, but understand their mistake. The regulations define a primary producer as "any person who actually films, videotapes, or photographs *a visual depiction of* actual sexually explicit conduct," 28 C.F.R. § 75.1(c)(1) (emphasis added). The italicized language is a tautology, however, because the obvious purpose for creating the category of primary producers is to identify those who have direct contact with the performers and can therefore personally examine and record the identification documents presented by them. Nevertheless, appropriationists appear to fall within the definition of "secondary producers." If they do, the application of the Act to them would raise a serious First Amendment problem because of the difficulty they may encounter in securing the information that secondary producers are required to keep on file. It is a problem, however, that cannot be resolved on the present record. *See Renne*, 501 U.S. at 321–22, 111 S.Ct. at 2338–39.

■ The next objection concerns the inclusion within the definition of "secondary producers" of persons who duplicate or reproduce sexually explicit materials that are intended for commercial distribution. 28 C.F.R. § 75.1(c)(2). Appellees point out that such persons include printers, film processors, and video duplicators whose roles are functionally indistinguishable from that of photo processors, who are specifically excluded from the definition of "producer." *See id.* § 75.1(c)(4)(i). As we understand the photo processing exception, it applies to persons to whom a producer delivers films for development or the making of prints and who, on completing their work, return the films and prints to the producer. The Government does not explain what interest is served by according different treatment to printers, film processors, and video duplicators whose sole function is to provide similar services to a producer. We agree, therefore, that the Act does not apply to persons who perform such services and return their work product to the producer who employed them.

■ Third, we address the district court's contention that "the Act is overly burdensome because it will invade the privacy of adult models and discourage them from engaging in protected expression" because "[e]xposure of their true names, aliases, and addresses could subject them to stigmatization, harassment and ridicule from others." *ALA II*, 794 F.Supp. at 419. The Act and its implementing regulations, however, do not require that this information be disclosed to anyone other than "the Attorney General or his delegee," 28 C.F.R. § 75.5, the persons for whom they willingly pose while engaged in sexual acts, and those who publish the resulting pictures or videotapes. The first of these has a legitimate right to the information, and we believe we may safely assume that the performers are not concerned over the prospect of being stigmatized, harassed, or ridiculed by the producers they help enrich.

■ Finally, we reject the district court's complaint that the Act "will effectively ban foreign produced images of sexually explicit conduct." *ALA II*, 794 F.Supp. at 418. Foreign producers who wish to peddle their products in the United States should be expected to abide by our laws no less than domestic producers. *Compare, e.g.,* 17 U.S.C. § 602 (1988) (prohibiting the importation of works that infringe on U.S. copyrights). Although the Government may not have other than a humane interest in protecting foreign children from exploitation, it has a most definite interest in plugging a loophole that would be created for domestic child pornographers if they were able to send their wares to secondary producers abroad for reexport to the United States.

### III. Conclusion

For the reasons described above, we conclude that the Act is a content-neutral statute that serves a compelling Government interest; and we find that its provisions meet the intermediate scrutiny standard established by the Supreme Court's First Amendment jurisprudence. We acknowledge that certain provisions and potential applications of the regulations exceed or may exceed constitutional bounds. Nevertheless, we are satisfied that the Act and regulations are constitutional as they apply to the vast majority of the materials affected by them, namely, the commercially produced books, magazines, films, and videotapes that cater to "adult" tastes. Therefore, although we disallow certain provisions or applications of the regulations, we reverse the district court's holding that the Act is unconstitutional as it applies to materials depicting adults engaged in actual sexual conduct.

*So ordered.*

JOHN W. REYNOLDS, District Judge, dissenting.

This law is overbroad, chilling, and a questionable deterrent to child pornography, and thus runs contrary to the First Amendment. The majority opinion permits an unwarranted intrusion into the First Amendment rights of citizens who are not child pornographers. Therefore, I respectfully dissent.

The statute regulates a wide variety of material—some kinds more protected by the First Amendment than others. Some material covered by the statute is "obscene" under *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973),[1] or is child pornography, and not protected speech at all. *See New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). Some of the material is "indecent," but indecent, non-obscene speech is protected by the First Amendment, albeit the trend in Supreme Court cases appears to be to relax the standard of review for such speech. *Compare Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989) (ban on indecent telephone

---

1. In order to determine whether material is "obscene," the Supreme Court has formulated a three-part test:

 (a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest;

 (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable ... law; and

 (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Id.* at 24, 93 S.Ct. at 2615 (citations omitted).

message services violated the First Amendment because it exceeded what was necessary to serve the compelling interest of preventing exposure of minors to the messages) *with Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (Rehnquist, J., plurality opinion) (nude dancing is only marginally within the parameters of First Amendment protection). The law also regulates depictions which may have a significant educational, artistic, or political value, and which receive full First Amendment protection.

Although the statute reaches far beyond depictions which involve or are likely to involve children, it regulates each of these areas in the same burdensome manner. As such, the law is overbroad and chilling, and it is impossible to rewrite it through judicial means so that it survives First Amendment scrutiny.

I am not convinced that this statute is "content neutral." On its face, it is directed at a particular type of expression. This law does not have a merely "incidental limitation" on expression protected by the First Amend-

ment. However, even under the more relaxed standard applied to content-neutral regulation of expressive conduct propounded in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968),[2] this statute must be stricken. There is enough "bite" left in the *O'Brien* standard to strike a statute when it has more than incidental effects on First Amemdment expression and does not effectively further an important governmental interest. The statute cannot even be used for its intended purpose of helping to prosecute child pornographers, because the Act itself precludes the use of the records, directly or indirectly, in a child pornography prosecution.

Thus, I would affirm the lower court's opinion.

---

**2.** Under *O'Brien,* a content-neutral government regulation of expressive conduct is justified if that regulation: (1) is within the government's constitutional power; (2) furthers a substantial governmental interest; (3) the governmental interest is unrelated to free speech; (4) incidental restrictions on First Amendment freedoms are "no greater than is essential to the furtherance of that interest." *Id.*