RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0430p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

CONNECTION DISTRIBUTING CO.; RONDEE KAMINS;
JANE DOE; JOHN DOE,

*Plaintiffs-Appellants,*

*v.*

No. 06-3822

PETER D. KEISLER,[*] Acting Attorney General of the
United States,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 95-01993—John M. Manos, District Judge.

Argued: April 26, 2007

Decided and Filed: October 23, 2007

Before: KENNEDY, MOORE, and McKEAGUE, Circuit Judges.

_____

### COUNSEL

**ARGUED:** J. Michael Murray, BERKMAN, GORDON, MURRAY & DEVAN, Cleveland, Ohio,
for Appellants. Anne Murphy, UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Appellee. **ON BRIEF:** J. Michael Murray, Lorraine R. Baumgardner, BERKMAN,
GORDON, MURRAY & DEVAN, Cleveland, Ohio, for Appellant. Anne Murphy, Thomas M.
Bondy, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

KENNEDY, J., delivered the opinion of the court. MOORE, J. (pp. 18-22), delivered a
separate concurring opinion. McKEAGUE, J. (pp. 23-27), delivered a separate opinion concurring
in part and dissenting in part.

_____

[*]Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Acting Attorney General Peter D. Keisler is
automatically substituted for former Attorney General Alberto R. Gonzales.

1

---

**OPINION**

---

KENNEDY, Circuit Judge.  Connection Distributing, Rondee Kamins, Jane Doe, and John Doe ("Plaintiffs") appeal the judgment of the district court granting summary judgment to the government.  Plaintiffs had challenged the recordkeeping requirements 18 U.S.C. § 2257 placed upon producers of images of "actual sexually explicit conduct" as violative of the First Amendment.  We conclude that the statute is overbroad and therefore violates the First Amendment, and accordingly we reverse the district court's judgment and remand with instructions to enter summary judgment for the plaintiffs.

**BACKGROUND**

I. The Challenged Statute

Congress passed the Child Protection and Obscenity Enforcement Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181, 4485-4503 (1988) ("Act") to further support its laws against child pornography.  Among other things, it required producers of certain kinds of photographs to maintain records regarding the individuals depicted.  Congress subsequently modified the recordkeeping provisions twice, with the Child Protection Restoration and Penalties Enhancement Act of 1990, Pub. L. No. 101-647, Title III, §§ 301(b), 311, 104 Stat. 4808 (1990), and the Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 (PROTECT Act), Pub. L. No. 108-21 § 511, 117 Stat. 650 (2003).

All the various amendments have made the reach of the recordkeeping requirements of 18 U.S.C. § 2257 extensive.  While the requirements apply only to producers, that term is defined broadly.  Producers include all those who actually create a visual representation of actual sexually explicit conduct, through videotaping, photographing, or computer manipulation.  18 U.S.C. § 2257(h)(2)(A)(i) (2006).  These kinds of producers are defined as "primary producers" under the regulations issued by the Attorney General. 28 C.F.R. § 75.1(c)(1) (2006).  Those who, for commercial purposes, use such images for "assembling, manufacturing, publishing, duplicating, reproducing, or reissuing" any material containing that image, from a photograph to a magazine or film, are also producers.  18 U.S.C. § 2257(h)(2)(A)(ii) (2006).  Finally, those who upload such images to a website or otherwise manage the content of the website are considered producers.  *Id.* § 2257(h)(2)(A)(iii) (2006).  These last two types of producers are considered "secondary producers" under the applicable regulations. 28 C.F.R. § 75.1(c)(2) (2006).  On the other hand, those who process images and have no commercial interest in such images, those who merely distribute the images, those who provide Internet or telecommunications services, or who store, retrieve, host, format, or translate the communication without selecting or altering its content are not producers.  18 U.S.C. § 2257(h)(2)(B) (2006); 28 C.F.R. § 75.1(c)(4) (2006).  They are, however, required to verify that the required records have been kept by the creator and that disclosure statements are attached to the images.  18 U.S.C. § 2257(f)(4) (2006).

Image producers are only regulated if the images are of "actual sexually explicit conduct." 18 U.S.C. § 2257(a)(1) (2006).  "Actual sexually explicit conduct" is defined to include images of "sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex."  18 U.S.C. § 2257(h)(1) (2006); *see* 18 U.S.C. § 2256(2)(A)(i) (2006).  It also includes images of bestiality, masturbation, sadistic or masochistic abuse, and "lascivious exhibition of the genitals or pubic area of any person."  18 U.S.C. § 2257(h)(1) (2006); *see* 18 U.S.C. § 2256(2)(A)(ii)-(v) (2006).

If a person is producing such images, she or he is subject to the recordkeeping requirements. The producer must inspect the depicted individual's government-issued picture identification and ascertain her or his name and date of birth. 18 U.S.C. § 2257(b)(1) (2006); 28 C.F.R.§ 75.2(a)(1). The producer must then make a photocopy of the ID, ascertain and record any aliases the person has used in the past, photocopy the image, record where the image is published if it is published on the Internet, and then file in alphabetical or numerical order all of this information in separately maintained records. 18 U.S.C. § 2257(b) (2006); 28 C.F.R. § 75.2(a), (d), (e). These records are then subject to inspection by agents of the Attorney General, without advance notice, up to once every four months and more often if there is "a reasonable suspicion to believe that a violation . . . has occurred . . . ." 18 U.S.C. § 2257(c) (2006); 28 C.F.R. § 75.5(b), (c), (d) (2006).

If the person is required to keep such records, then she or he is also required to affix a statement to the image. The statement has to contain either a title or identifying information, the date of production, and a street address of the place where the records are being maintained. 18 U.S.C. § 2257(e) (2006); 28 C.F.R. § 75.6(a), (b). The statement must be in at least 12-point font or no smaller than the second-largest typeface on the material, and it must be printed in a color that contrasts with the background. 28 C.F.R. § 75.6(e) (2006). Additionally, the statement must be "prominently displayed" on or in the depiction. Some materials, such as books, have a more precise definition of what is required for "prominent[] display." *Id.* § 75.8.

Failure to create or maintain these records, making a false or inappropriate entry in kept records, or failure to affix the required statements to such images results in stiff penalties. 18 U.S.C. § 2257(f)(1), (3) (2006). The producer would be guilty of a felony punishable up to five years in prison as well as subject to fines. *Id.* § 2257(i). For a second offense, she or he would be subject to a minimum of two years and a maximum of ten years in prison plus a fine. *Id.* Selling, transferring, or offering to sell or transfer any material, such as a book or magazine, which includes a depiction of actual sexually explicit conduct without the disclosure statement, with certain exceptions, is a violation of the statute similarly punishable. *Id.* § 2257(f)(4).

## II. Factual Background

As we explained in an earlier iteration of this case:

> Connection publishes and distributes approximately a dozen so-called "swingers" magazines. Connection defines the philosophy of "swinging" as: "an alternative social and sexual lifestyle comprised mostly of mature adults who believe in sexual freedom and do not believe in sexual monogamy." Connection's magazines contain, in addition to editorials and feature stories, messages placed by persons whose beliefs and philosophies embrace the "swinging" lifestyle. These individuals and couples place and respond to messages in Connection's various magazines. The messages . . . frequently are accompanied by sexually explicit photographs of the subscribers. Some messages include photographs with persons simply nude or in street clothes, but many feature individuals or couples engaged in sexually explicit conduct. . . . [T]he majority of the people submitting messages identify themselves through a code that appears at the beginning of the text of each message. Readers respond by writing to Connection, which charges a fee to forward the response to the message placer. Connection also offers 900 number voice mailboxes for individuals who wish to respond by telephone, as well as an Internet service.

*Connection Distrib. Co. v. Reno*, 154 F.3d 281, 285 (6th Cir. 1998) (*Connection I*) (footnotes and citations omitted).  The individual plaintiffs in this case are persons who would like to publish their photographs in Connection's magazines, but are unwilling to do so because they do not wish to create and maintain the required records nor do they wish to provide Connection with identification, which Connection must have to comply with the recordkeeping provisions at issue.

### III. Procedural History

Connection filed a declaratory judgment action in September 1995 challenging the facial and as-applied constitutionality of the recordkeeping requirements of 18 U.S.C. § 2257, and asking for an injunction against enforcement.  Connection asked for a preliminary injunction based on its as-applied challenge, which the district court denied in January 1997.  This Court upheld the district court's denial of a preliminary injunction based on Connection's as-applied challenge to the statute.  *Connection I*, 154 F.3d 281.

Upon remand, the district court granted the government's motion for summary judgment.  Connection appealed, and the case came to this Court again.  A second panel reversed the district court's grant of summary judgment.  *Connection Distrib. Co. v. Reno* (*Connection II*), 46 F. App'x 837 (6th Cir. 2002) (per curiam) (unpublished).  It held that while intermediate scrutiny constituted law of the case for Connection's as-applied claim, the district court on remand should reconsider "all other respects . . . in light of recent Supreme Court decisions." *Id.* at 837-38.  We note preliminarily that this opinion will not deal with the law of the case doctrine regarding the previous opinions, as here we evaluate the plaintiffs' facial claims, rather than Connection's as-applied challenges with which the previous opinions dealt; we are deciding this case on overbreadth grounds, which allows parties to raise claims third parties could bring, rather than just their own claims, which the previous opinions addressed.

On remand the district court allowed additional discovery, and also allowed Connection to amend its complaint.  Connection added three plaintiffs, Rondee Kamins, its publisher, and two Doe plaintiffs, who wish to publish sexually explicit images in Connection's magazines.  Connection also added a Fifth Amendment challenge to the statute.  This challenge was in response to Congress's amending of § 2257 to allow the records kept to be used by the government for prosecuting more crimes than recordkeeping violations, which is all the statute previously had allowed.  PROTECT Act, Pub. L. No. 108-21 § 511, 117 Stat. 650, 684-85 (2003).

The government then moved to dismiss the amended complaint or, in the alternative, for summary judgment.  The plaintiffs sought a preliminary injunction to prevent enforcement of the amended statute, as well as the subsequently enacted regulations.  The district court considered the remand narrow, and therefore only evaluated its previous conclusions with respect to the four specific Supreme Court cases mentioned in the decision vacating its previous grant of summary judgment to the government.[1]  It concluded that these cases did not change its analysis, and therefore reaffirmed its conclusion that the statute did not violate the First Amendment. The district court also rejected the plaintiffs' argument that the statute violated the Fifth Amendment.  The district court therefore denied the plaintiffs' request for a preliminary injunction and granted the government's motion for summary judgment, and plaintiffs timely appealed.

---

[1] The cases mentioned were *Watchtower Bible & Tract Society of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150 (2002), *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002), *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), and *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000).  *Connection II*, 46 F. App'x at 837.

## ANALYSIS

Plaintiffs argue on appeal that the district court erred in granting summary judgment for the government. Grants of summary judgment are reviewed de novo. *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 619 (6th Cir. 2006). Summary judgment is granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party, the defendant here, first carries the burden of proving that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 316, 323 (1986). This case involves no genuine issue of material fact; rather, the disagreement is about the proper legal framework to apply to the undisputed facts. Questions of law are reviewed de novo. *Johnson v. Jones*, 149 F.3d 494, 499 (6th Cir. 1998). Because the district court's analysis of the overbreadth of the statute was incorrect, the grant of summary judgment for the government is REVERSED, and, because plaintiffs are entitled to summary judgment, the case is REMANDED with instructions to enter judgment for the plaintiffs.

### I. Statutory Construction

When engaging in an overbreadth analysis, we must first examine the scope of the statute and try to construe that scope narrowly to avoid constitutional infirmity. *Ferber*, 458 U.S. at 769 n.2 ("When a federal court is dealing with a federal statute challenged as overbroad, it should, of course, construe the statute to avoid constitutional problems, if the statute is subject to such a limiting construction."). "In considering a facial challenge, this Court may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 884 (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988)). "This Court 'will not rewrite a . . . law to conform it to constitutional requirements.' " *Am. Civil Liberties Union*, 521 U.S. at 884-85 (quoting *Virginia v. Am. Bookseller's Ass'n, Inc.*, 484 U.S. 383, 397 (1988)).

The breadth of the recordkeeping provisions here cannot be narrowed. By its clear, unambiguous terms, the statute applies to any "producer" of photographs depicting actual sexually explicit conduct, 18 U.S.C. § 2257(a), and "produces" is defined to include anyone who creates the visual representation, for instance a photographer or videographer, as well as anyone who subsequently publishes the image, *id.* § 2257(h)(2). This means that couples submitting photographs to Connections, or any couples who take photographs for their own personal use, must create the required records upon creation of the image because either one has or both have "produced" regulated images. The statute by its plain terms makes no exception for photographs taken without a commercial purpose, for photographs intended to never be transferred, or for photographs taken with any other motivation. If the photograph depicts actual sexually explicit conduct, a record must be kept by the person creating the image. Additionally, the disclosure statement regarding where the records are kept must be affixed to every image created, regardless of whether a person plans on selling or otherwise transferring the image. *Id.* § 2257(e)(1), (f)(3). It is a separate violation of the statute if a person, including the creator, wishes to sell or otherwise transfer a photograph without a disclosure statement and either does so or offers to do so. *Id.* § 2257(f)(4).

This reach is extremely broad, and the most commonsense limitation, for which the statute and regulations provide some support, would be to limit the statute's reach to photographs taken for a commercial purpose, that is, photographs taken for the purpose of sale.[2] While there are some

---

[2]The statute requires records to be kept "at [the producer's] business premises . . . ." *Id.* § 2257(c). The regulations limit secondary producers to those who compile regulated photographs into an item "intended for commercial distribution." 28 C.F.R. § 75.1(c)(2). The regulations also require the records to be made "available at the producer's place of business . . . [and provides that] [i]f the producer ceases to carry on business, the records shall be maintained

hints Congress may have intended such a limitation, these hints are insufficient to contradict the plain language of the statute.

The plain text and definitions of the terms used admit of no commercial limitation on who will be considered producers. While the statute does say that records should be kept at a producer's "business premises," it follows up with allowing records to be kept "at such other places as the Attorney General may by regulation prescribe." 18 U.S.C. § 2257(c). The word "produces" merely means "creates" according to the statute, and a person can create an image for noncommercial motivations just as a person can create an image for commercial reasons. *See id.* § 2257(h)(2)(A)(i). The inspection regulation reinforces the notion that a person does not have to be in the business of producing such images to be covered by the statute. While the regulation provides that inspections will occur during "normal business hours," it also deals with those producers who "do[] not maintain at least 20 normal business hours per week." 28 C.F.R. § 75.5(c)(1). Additionally, and perhaps most persuasively, Congress knew how to limit the statute's reach to the commercial context because it chose to require only commercially-motivated publishers, termed secondary producers by the regulations, to keep records. *See* 18 U.S.C. § 2257(h)(2)(A)(ii) (2006). Congress did not, however, include a requirement that the creators of the images, termed primary producers by the regulations, intend to commercially distribute the images before being subject to the recordkeeping requirements. *See id.* § 2257(h)(2)(A)(i).

The legislative history of the Act reinforces a reading which does not limit the recordkeeping requirements to those in the business of creating the regulated images. Congress's purpose was to prevent child abuse and to aid the government in establishing the age of persons depicted in any photographs of actual sexually explicit conduct that come to the attention of the police. *See, e.g.*, *Am. Library Ass'n*, 33 F.3d at 86; *see also* 1 ATTORNEY GENERAL'S COMMISSION ON PORNOGRAPHY: FINAL REPORT 620 (1986). Congress therefore required recordkeeping by everyone taking such photographs, no matter the purposes. Parents, relatives, and others may abuse children and photograph the abuse with no commercial motivation or commercial intent, and Congress sought to stop all such abuse. *See Am. Library Ass'n*, 33 F.3d at 86. Additionally, there will be photographs found by the police without a paper trail of their provenance if records must only be kept by those in the business or who have commercial intent at the time of creation. Photographs could be found in a private house that are in digital format and of unclear origin, and law enforcement would face the same trouble in proving the age of that individual depicted as it faces with commercially distributed images. Indeed, the government argues that the recordkeeping requirements must be "universal" to achieve its purpose. Def.'s Br. at 32. In addition, one of the reasons the police would like to know whether the person depicted is a child is to stop the circulation of the picture, because Congress believes, and the Supreme Court has recognized, that continued circulation harms the psyche of the child. *Free Speech Coal.*, 535 U.S. at 249-50; *see* J.A. at 118. This harm occurs even if the picture was created for noncommercial reasons and it was shared or lost or otherwise put into circulation.

Universal coverage comports with the testimony received before Congress and statements made by members of Congress. While Congress was no doubt very concerned with the commercial creation of child pornography, senators talked about "eradicating" all child pornography. *Child Protection and Obscenity Enforcement Act and Pornography Victims Protection Act of 1987: Hearing on S. 2033 and S. 703 Before the S. Comm. on the Judiciary*, 100th Cong. 2 (1988) [hereinafter *Senate Hearing*] (statement of Senator DeConcini), J.A. at 103. Congress heard testimony about how computer networks were used to "propose trades of homemade child

---

for five years thereafter." *Id.* § 75.4. Additionally, inspection of the records is limited to "normal business hours . . . or at any other time during which the producer is actually conducting business relating to producing depiction[s] of actual sexually explicit conduct." *Id.* § 75.5(c)(1).

pornography which is *produced* when pedophiles record the sexual abuse of children on film or videotape." *Senate Hearing* at 27 (testimony of H. Robert Showers, Executive Director, National Obscenity Enforcement Unit, U.S. Department of Justice [hereinafter Showers]), J.A. at 115 (emphasis added). Congress was told that "[c]hild pornography itself is nothing less than the sexual abuse, rape, and molestation of real children, permanently captured on film, for the profit, *entertainment* and *gratification* of child molesters." *Senate Hearing* at 32 (testimony of Showers), J.A. at 118 (emphasis added). Indeed, Senator Hatch, a sponsor of the Act, stated that he believed existing statutes had "been fairly successful in putting an end to the regular monthly publications that appeared on some news stands," but that the recordkeeping provisions and other aspects of the Act were required because "the supply of these materials for an ever increasing market has shifted to a well-organized network of child molesters who simply make their own recordings or photographs and share them between themselves."[3] *Senate Hearing* at 110 (statement of Senator Hatch), J.A. at 157. Indeed, a "commercial purpose" limitation was proposed by the ACLU for the crime of transferring obscenity, and Senator Humphrey considered such a limitation inimical to Congress's purpose in ensuring that such images are taken out of circulation, commercial or otherwise, so as to not fall into the hands of children. *Senate Hearing* at 81 (statement of Senator Humphrey), J.A. at 142. The recordkeeping provisions have a similar purpose of ending circulation of child pornography, and a commercial purpose limitation would similarly fail to fully accomplish Congress's objective.

The plain text, the purpose, and the legislative history of the statute make clear that Congress was concerned with all child pornography and considered recordkeeping important in battling all of it, without respect to the creator's motivation. There is, therefore, no narrowing construction. *See Am. Civil Liberties Union*, 521 U.S. 844, 884-85 (1997) ("[W]e declined to 'dra[w] one or more lines between categories of speech covered by an overly broad statute, when Congress has sent inconsistent signals as to where the new line or lines should be drawn' because doing so 'involves a far more serious invasion of the legislative domain.' " (quoting *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 479 n.26 (1995)) (alteration in original) ("This Court 'will not rewrite a . . . law to conform it to constitutional requirements.' " (quoting *Virginia v. Am. Bookseller's Ass'n, Inc.*, 484 U.S. 383, 397 (1988))); *City of Houston v. Hill*, 482 U.S. 451, 468 (1987) ("This ordinance is not susceptible to a limiting construction because . . . its language is plain and its meaning unambiguous."). With the reach of the statute properly defined, we now turn to the overbreadth analysis.

## II. Facial Overbreadth

The overbreadth doctrine allows a party to challenge a statute on its face, even if the statute would be considered constitutional as applied to that party. *Broadrick v. Oklahoma*, 413 U.S. 600, 612 (1973). "In order to decide whether the overbreadth exception is applicable in a particular case, we have weighed the likelihood that the statute's very existence will inhibit free expression." *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 787, 799 (1984). There are a few considerations to be weighed when determining overbreadth. The first is whether and to what extent the statute reaches protected conduct or speech. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 486, 494 (1982) ("In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of

---

[3]Many of the stories told by victims of child abuse who had been photographed described situations which did not clearly rise to the level of a commercial enterprise, or even clearly suggest a profit motive for the taking of the photographs. *See, e.g.*, J.A. at 260 (family friends took Polaroids of daughter); J.A. at 265 (discussing collections of self-made pornography whose existence torments victims because they are unsure if it has been "sold or traded to other collectors"); J.A. at 284 (school bus driver took photos of three young children); J.A. at 284 (teacher took photos of schoolgirl in the bathroom); J.A. at 285 (describing a "local child pornographer" who "shared" images); J.A. at 288-89 (describing the difficulty in locating pornographic pictures of children taken by "amateurs").

constitutionally protected conduct." (footnotes omitted)). The second is determining the "plainly legitimate sweep" of the statute, that is, the sweep that is justified by the government's interest. *See Broadrick*, 413 U.S. at 615; *cf. Taxpayers for Vincent*, 466 U.S. at 810 ("[T]he application of the ordinance in this case responds precisely to the substantive problems which legitimately concerns the City."). The third is determining the likely chilling effects of the statute, stated otherwise as the statute's burden on speech. *See Broadrick*, 413 U.S. at 615; *see also Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (unanimous); *Taxpayers for Vincent*, 466 U.S. at 800 n.19; *New York v. Ferber*, 458 U.S. 747, 773 (1982). The last step involves weighing these various factors together, paying particular attention to the burden on speech when judging the illegitimate versus legitimate sweep of the statute. *Broadrick*, 413 U.S. at 615 ("[P]articularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."); *see Watchtower Bible and Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 165 (2002) ("We must also look, however, to the amount of speech covered by the ordinance and whether there is an appropriate balance between the affected speech and the governmental interests that the ordinance purports to serve.").

## A. Type of Speech at Issue

Before engaging in the overbreadth analysis, we must first identify whether the expression at issue is conduct or speech. Conduct is generally considered more amenable to regulation than speech, because while particular conduct could be expressive, it may not be inherently expressive like speech. *See Free Speech Coal.*, 535 U.S. at 253 ("To preserve [free speech] freedoms, and to protect speech for its own sake, the Court's First Amendment cases draw vital distinctions between words and deeds, between ideas and conduct."); *Broadrick*, 413 U.S. at 615 (noting that a statute must be substantially overbroad, particularly where conduct is concerned); *see also Cameron v. Johnson*, 390 U.S. 611, 617 (1968) (upholding a law on the basis that it regulates conduct that is not inherently expressive and therefore only tangentially and insubstantially burdens speech).

The government argues that the recordkeeping requirements are simply aimed at conduct, because it seeks to reduce child abuse by its regulation. Indeed, the Supreme Court recognized in *Ferber* that the very reason child pornography can be regulated is because it is so closely tied to the conduct, child abuse, which the government was trying to stamp out. *Ferber*, 458 U.S. at 761. The D.C. Circuit accepted the government's argument, and therefore evaluated the statute at issue under the *O'Brien* standard. *Am. Library Ass'n v. Reno*, 33 F.3d 78, 87 (D.C. Cir. 1994).

This argument is unpersuasive. While the government is indeed aiming at conduct, child abuse, it is regulating protected speech, sexually explicit images of adults, to get at that conduct. To the extent the government is claiming that a law is considered a conduct regulation as long as the government claims an interest in conduct and not speech, the Supreme Court has rejected that argument. *See, e.g., Schneider v. State*, 308 U.S. 147, 150 (1939) (holding that the government cannot ban handbills, speech, to vindicate its interest in preventing littering, conduct). The expression at issue here is not conduct, it is speech. Images, including photographs, are protected by the First Amendment as speech as much as "words in books" and "oral utterance[s]." *Kaplan v. California*, 413 U.S. 147, 119-20 (1973). Indeed, visual images are "a primitive but effective way of communicating ideas . . . a short cut from mind to mind." *W. Va. State Bd. of Ed. v. Barnette*, 319 U.S. 624, 632 (1943). Even if the government tried to characterize the regulation as aimed at the conduct of pressing the button on a camera or other recording device to create images, that conduct would be so closely tied to the speech produced, and the government's interest here is in the speech produced, that it would be better considered to be a speech regulation.

Child abuse, the actual conduct in which the government is interested, is already illegal. Child pornography, while speech, can be considered more like conduct because the conduct depicted is illegal, and if that illegality did not occur, no images of child pornography would be created.

*Ferber*, 458 U.S. at 762 ("We note that were the statutes outlawing the employment of children in these films and photographs fully effective, and the constitutionality of these laws has not been questioned, the First Amendment implications would be no greater than that presented by laws against distribution: enforceable production laws would leave no child pornography to be marketed."). Banning the images of child pornography, therefore, is not a burden on speech, and can therefore be considered more of a conduct regulation, because the speech would not be created absent the illegal conduct. This reasoning would not necessarily apply to all pictures of illegal conduct, such as a newspaper article accompanied by a photograph of a person being mugged. Child pornography is different from other photographs of illegal conduct because the images more directly relate to the illegal conduct; when an individual is taking photographs of child abuse, it is likely that the taking of pictures is a motivator of the illegal conduct, and therefore the speech is more "intrinsically related" to the conduct. *Ferber*, 458 U.S. at 759-60; *cf. Free Speech Coal*, 535 U.S. at 250 ("Virtual child pornography is not 'intrinsically related' to the sexual abuse of children, as were the materials in *Ferber*.").

This analysis of child pornography, that it is closer to conduct and not speech, does not control when determining whether images of adult sexual conduct are speech or conduct. Adult sexual conduct is not illegal and it is in fact constitutionally protected. *See, e.g.*, *Lawrence v. Texas*, 539 U.S. 558 (2003). The regulation of visual depictions of adult sexual activity is not based on its intrinsic relation to illegal conduct. It is, therefore, a regulation of speech, because both the photograph and the taking of a photograph "bear[] [a] necessary relationship to the freedom to speak, write, print or distribute information or opinion." *Schneider*, 308 U.S. 147, 150 (1939). This leads us to the overbreadth considerations.

## B. Amount of Protected Speech Impacted

The first consideration in an overbreadth challenge is the amount of protected speech reached by the statute. *Flipside, Hoffman Estates, Inc.*, 455 U.S. at 494. As described in Section I, the recordkeeping provisions have an extensive reach. Records are required to be kept and disclosure statements are required to be affixed by any person who takes a photograph or films a movie depicting actual sexually explicit conduct. This conduct is defined as "sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex." 18 U.S.C. § 2257(h)(1) (2006); *see* 18 U.S.C. § 2256(2)(A)(i) (2006). It also includes bestiality, masturbation, sadistic or masochistic abuse, and "lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2257(h)(1) (2006); *see* 18 U.S.C. § 2256(2)(A)(ii)-(v) (2006). This means that a married couple who videotape or photograph themselves in the bedroom engaging in sexually explicit conduct would be required to keep records, affix disclosure statements to the images, and hold their home open to government agents for records inspections.

This reach sweeps in a lot of protected speech. This includes images which amount to obscenity but are kept in the privacy of one's home and are therefore constitutionally protected speech. *Stanley v. Georgia*, 394 U.S. 557, 564-68 (1969). Nonobscene sexually explicit images of adults are also considered protected speech and are covered by the statute. *See Free Speech Coal.*, 535 U.S. at 250-51 ("[*New York v. Ferber*] reaffirmed that where the speech is neither obscene nor the product of sexual abuse, it does not fall outside the protection of the First Amendment." ); *see also Am. Civil Liberties Union*, 521 U.S. at 874; *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72-73 (1994); *Sable Commc'ns of Ca., Inc. v. FCC*, 492 U.S. 115, 126 (1989) (unanimous); *Osborne v. Ohio*, 495 U.S. 103, 112 (1990); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 490, 498-99 (1985). Additionally, the First Amendment protects an individual's right to speak anonymously. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995) ("[A]n author's decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment."). This statute not only regulates a person's right to take sexually explicit photographs, but it also requires that person to identify him or herself as the photographer as well as identify the individual

depicted. While the individual depicted is shown in the photograph, that person still has a First Amendment right to not provide his or her name and therefore retain a certain level of anonymity. *See Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 536 U.S. at 167 ("The fact that circulators revealed their physical identities did not foreclose our consideration of the circulators' interest in maintaining their anonymity [in *Buckley v. Valeo*, 424 U.S. 1 (1976)]."). It is clear that this statute covers quite a bit of protected speech.

### C. Legitimate Sweep

Because the statute reaches protected speech, it is necessary to determine the statute's "plainly legitimate sweep." *Broadrick*, 413 U.S. at 615. This requires identifying the government's interests. There are two interests here: (1) being able to know the age of a person depicted and the location of the producer so as to effectively prosecute individuals for child abuse and production of child pornography; and (2) protecting children against abuse. These interests relate to stamping out child pornography.

Child pornography is clearly within the legitimate sweep of this statute. It is uncontested that the government may regulate or otherwise ban child pornography. *Osborne*, 495 U.S. at 109-15; *Ferber*, 458 U.S. at 773. The government imposing recordkeeping regulations on the producers of child pornography is surely legitimate; it helps accomplish the government's compelling interest in safeguarding the physical and psychological well-being of minors. *See Osborne*, 495 U.S. at 109-10; *Sable Commc'ns of Ca., Inc.*, 492 U.S. at 126.

Applying the recordkeeping regulations to all depictions of actual sexually explicit conduct between two adults, however, is not clearly within the statute's plainly legitimate sweep. One of the reasons the government wants to know a depicted individual's age is because the government has a difficult time knowing when to prosecute as well as prosecuting successfully because it is hard to identify the image as that of a child. The government claims that such identification is made difficult because images of individuals eighteen and older exist. If these images did not exist, then the only images left would be children, and therefore the proof would be easy. The solution, it is argued, is to require photographs of both adults and children to be kept track of, so that the government will know that a photo it is currently viewing is not of a child but in fact of an eighteen-year-old.

This reasoning has been rejected by the Supreme Court. In *Ashcroft v. Free Speech Coalition* the government made the exact same argument for upholding a law against possessing or creating images that "appear to be" children; if there are all these images out there that "appear to be" children but are not, then the defense will claim, and the government will have difficulty contradicting, that these images are the ones that merely resemble child pornography. 535 U.S. at 254-55. The Supreme Court rejected this argument, saying that it "turns the First Amendment upside down." *Id.* "Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse." *Id.* at 255.

Indeed, much of the statute's sweep would not be legitimated even if this case does not foreclose the government's ability to regulate so as to prevent defenses and aid prosecution in this manner. This statute covers images of actual sexually explicit conduct regardless of the obvious age of those depicted and regardless of whether or not the photographer actually knows the age of the person being photographed, for instance if the person being photographed is the photographer's significant other. These images are not within the "legitimate sweep" of the statute because it does not vindicate the government's interest to cover them.

While the government argues that coverage of these images is legitimate because subjective determinations of a person's age lead to uneven enforcement and greater difficulty in prosecution,

J.A. at 32, this does not seem to be the case. The government's own expert testified that he did not need photo identification to conclude that the "vast majority" of individuals depicted in a handful of Connection's magazines were over the age of twenty-one. J.A. at 479. He further stated that he would not expect anyone else to need photo identification to come to that conclusion. J.A. at 479. It is also noteworthy that the government has before argued that such a subjective determination is not so difficult to ask people to make nor too difficult for the government to enforce. *See United States v. Acheson*, 195 F.3d 645, 652-53 (11th Cir. 1999), *abrogated by Free Speech Coal.*, 535 U.S. 234; *United States v. Hilton*, 167 F.3d 61, 73-76 (1st Cir. 1999), *abrogated by Free Speech Coal.*, 535 U.S. 234. We see no reason why an age limitation, such as one that requires the person depicted appear to be a child before records must be kept, could not be employed here.

The government contends in this case, however, that "appears to be" a child is not a sufficient sweep because there are photographs solely of body parts, and a secondary producer, who would not necessarily meet the individual in person, would find it too difficult to apply such a standard. Def.'s Br. at 32. This argument is unconvincing. There is no reason the government could not satisfy this interest by regulating those images that depict only body parts without a significant amount of context portrayed to adequately appraise the depicted individual's age. Indeed, Justice Thomas in his concurrence in *Free Speech Coalition* suggested that "if technological advances thwart prosecution of 'unlawful speech,' the Government may well have a compelling interest in barring or otherwise regulating some narrow category of 'lawful speech' in order to enforce effectively laws against pornography made through the abuse of real children." 535 U.S. at 259. Even he would limit the government to "some narrow category of 'lawful speech,' a category for which the government has not here argued or defined.

### D. Burden

The burden on protected speech is also part of the inquiry into a statute's overbreadth. *Ferber*, 458 U.S. at 773 ("[T]he penalty to be imposed is relevant in determining whether demonstrable overbreadth is substantial."); *see also Taxpayers for Vincent*, 466 U.S. at 799 ("In order to decide whether the overbreadth exception is applicable in a particular case, we have weighed the likelihood that the statute's very existence will inhibit free expression."). This recordkeeping statute imposes multiple burdens. It bans anonymous images of actual sexually explicit conduct, and if records are not kept (if anonymity is not sacrificed), the person is guilty of a felony punishable by up to five years in prison and fines. 18 U.S.C. § 2257(a), (b), (f). The statute also requires all producers to keep records on each image and affix disclosure statements to the images. *Id.* § 2257(b), (e). While this burden may not be that large for a commercial entity, it is likely to be more burdensome for those motivated by noncommercial purposes. Indeed, the Supreme Court has recognized that imposing regulations on noncommercial sexually explicit speech is a burden that may be too great and consequently chill speech. *See Am. Civil Liberties Union*, 521 U.S. at 865. The statute here effectively bans creation of sexually explicit images unless such records are kept. The statute additionally burdens those that wish to publish photographs, as they are disallowed from doing so unless such records are kept, even if they did not take the photograph and have no other way to track the performers down to create the records. *Id.* § 2257(a), (h)(2)(A). Lastly, the statute burdens speech because it not only requires the person to keep records, it also allows the government to enter the premises where the records are kept at least once every four months, and perhaps more often, to inspect such records. *Id.* § 2257(c); 28 C.F.R. § 75.5 (2006).

These burdens lead to significant chilling effects. *See Hicks*, 539 U.S. at 119 ("We have provided this expansive remedy[, the overbreadth doctrine,] out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions."). The first chilling effect stems from the breadth of the statute; "[t]he ordinance's plain language is admittedly violated scores of times daily, yet only some individuals . . . are arrested" and prosecuted. *See Hill*, 482 U.S. at 466-67. There are

likely many violations occurring because people without commercial motivations may not realize that the recordkeeping requirements apply to their speech. This leads to chilling because it means that enforcers can seek out and silence particularly disliked people or speech. *See Thornhill v. Alabama*, 310 U.S. 88, 97-98 (1940); *see also Taxpayers for Vincent*, 466 U.S. at 798 & n.16.

Producers are also chilled if they are aware that the statute applies to all photographs of such conduct. To appreciate why speech would be chilled, consider the following. A couple wishes to take photographs of themselves engaging in sexual activity. To do so means compiling records, affixing statements, maintaining such records for at least five years, and opening their property up for visitation by government officials to inspect the records. It seems unlikely the couple would choose to speak when faced with such requirements, which if violated means being guilty of a felony punishable by up to five years in prison plus fines. The Supreme Court has recognized that a registration requirement imposes an "objective burden," which it thought would chill speech. *Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 536 U.S. at 167. Indeed, the Supreme Court has before stated that identification requirements tend to restrict speech. *Talley v. California*, 362 U.S. 61, 64 (1960). These requirements, which burden speech, are lighter burdens than those at issue here; registration is easier than filling out forms, storing them, affixing statements to images (statements which must contrast with the background of the photograph, be in at least twelve-point font, and be prominently displayed), and allowing inspections on her or his property.

Additionally, this statute "unquestionably attaches" criminal penalties to protected speech. A person's right to speak anonymously and a person's right to take photographs of adult actual sexually explicit conduct are protected. "[W]here the statute unquestionably attaches sanctions to protected conduct, the likelihood that the statute will deter that conduct is ordinarily sufficiently great to justify an overbreadth attack." *Taxpayers for Vincent*, 466 U.S. at 800 n.19; *see also Free Speech Coal.*, 535 U.S. at 244 ("[A] law imposing criminal penalties on protected speech is a stark example of speech suppression. . . . [E]ven minor punishments can chill protected speech . . . ."). People may choose to forego creating these photographs because losing their anonymity may subject them to " 'economic or official retaliation, . . . social ostracism, or merely . . . [destruction of too] much of one's privacy . . . .' " *Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 536 U.S. at 166 (quoting *McIntyre*, 514 U.S. at 341-42). Despite the fact that these records will not necessarily be open to the public, the statute does not provide for confidentiality, and therefore the anonymity analysis is not altered. *See Shelton v. Tucker*, 364 U.S. 479, 486 (1960) (pointing out that a statute requiring disclosure chills speech when there is no guarantee of confidentiality). These burdens are considerable.

### E. Weighing

The final step in the overbreadth analysis is weighing the above considerations against and with one another to determine whether or not the statute is facially invalid. *Broadrick*, 413 U.S. at 615. Before beginning the analysis, it is important to first note that applying the overbreadth doctrine to strike down a statute on its face "is, manifestly, strong medicine. It has been employed by the Court sparingly and only as a last resort." *Id.* at 613. Even though overbreadth is a doctrine to avoid the chilling effects of an overbroad law, "there are substantial social costs *created* by the overbreadth doctrine when it blocks application of a law to constitutionally unprotected speech, or especially to constitutionally unprotected conduct." *Hicks*, 539 U.S. at 119 (emphasis in original). It must be ensured that a decision "carefully ties" the use of the doctrine "to the circumstances in which facial invalidation of a statute is truly warranted." *Ferber*, 458 U.S. at 769. With this carefulness and prudence in mind, we are directed to gauge whether "the overbreadth of [the] statute . . . [is] real, [and] substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615; *see also Leonardson v. City of East Lansing*, 896 F.2d 190, 195-96 (6th Cir. 1990).

The recordkeeping statute fails this test. While constitutionally protected photographs of adult sexually explicit conduct and anonymity regarding one's depiction do not seem as vital to free speech and the country as political debate, "[w]e cannot be influenced . . . by the perception that the regulation in question is not a major one because the speech is not very important. The history of the law of free expression is one of vindication in cases involving speech that many citizens may find shabby, offensive, or even ugly." *Playboy Entm't Group, Inc.*, 529 U.S. at 826.

> [T]he mere fact that a statutory regulation of speech was enacted for the important purpose of protecting children . . . does not foreclose inquiry into its validity. As we pointed out last Term, the inquiry embodies an "overarching commitment" to make sure that Congress has designed its statute to accomplish its purpose "without imposing an unnecessarily great restriction on speech."

*Am. Civil Liberties Union*, 521 U.S. at 875-76 (quoting *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 741 (1996)) (footnotes omitted). The burden this recordkeeping statute places on protected speech is large; the statute unquestionably chills speech, particularly because violations are felonies punishable by up to five years in prison and a mandatory two years with a maximum of ten years in prison for a second offense. The government's interest in preventing child abuse and the consequent child pornography is "compelling," *Osborne*, 495 U.S. at 109-10, but it has to be balanced against the First Amendment right to free expression, *Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 536 U.S. at 163. The proper balance has not been struck by a recordkeeping statute that sweeps in a lot of protected speech, an amount of protected speech that may well be greater than the amount of unprotected speech covered by the statute. No one has argued, and it seems unlikely, that there is more child pornography in existence than adult pornography. While it is Congress's province to strike the proper balance between eradicating child pornography and safeguarding protected speech, this Court has the responsibility to ensure that protected speech is not overly burdened.

The government, however, argues that regulating all photographs of adult sexually explicit conduct is necessary to vindicate its interest in "eradicating" the unprotected speech. Def.'s Br. at 32. This is not the first time the government has alleged an all-encompassing statute was necessary to vindicate its interest in enforcing its valid criminal laws. In *Smith v. California* the government argued that it was necessary to omit scienter as an element of obscenity, otherwise prosecutions would fail because it would be impossible to prove commercial sellers knew the contents of an item were obscene. 361 U.S. 147, 154-55 (1959). The government asserted in *Stanley v. Georgia* that it was necessary to criminalize possession of obscenity because otherwise it would be impossible to prove that a person intended to distribute it or did in fact distribute it. 394 U.S. at 567-68. The government declared in *McIntyre* that it was necessary to require identification on handbills to be able to enforce its laws against fraud, false light, and libel. 514 U.S. at 344. It made the same identification arguments in *Talley*. 362 U.S. at 64, 66. The government insisted in *Shelton* that requiring teachers to disclose all of their organizational associations was necessary for it to properly evaluate a teacher's competence and fitness. 364 U.S. at 487-88. The government claimed in *Hill* that it was necessary to criminalize any verbal abuse directed at a police officer to maintain public order. 482 U.S. at 464-66. Finally, in a case similar to ours, the government alleged in *Free Speech Coalition* that banning virtual child pornography, which is created without using actual children, was necessary to effectively prosecute production and possession of child pornography, because doing so would deprive defendants of the ability to claim that the images were not real children.

In each of these cases, the Supreme Court ruled against the government and held the law facially invalid because of its overbreadth. The Court did not allow the government to criminalize private possession of obscene materials to prevent distribution because, it said, abridging freedom of speech "may not be justified by the need to ease the administration of otherwise valid criminal laws." *Stanley*, 394 U.S. at 567-68. The Court held that while proving scienter in an obscenity

prosecution is not easy, the government cannot chill free speech by excising this element. *Smith*, 361 U.S. at 154-55. The Court called handbill identification requirements "an aid to enforcement" that rendered "ancillary benefits" to the government's valid criminal prohibition of fraud and libel. *McIntyre*, 514 U.S. at 349-51. It said while such an aid is "legitimate," it is not valid when it affects such a large amount of protected speech. *Id.* The Court stated that if the government wants to prevent fraud, deceit, false advertising, negligent use of words, obscenity, and libel, requiring identification on all handbills is not a legitimate way to do so because such an "ordinance is not so limited, and [Justice Harlan] th[ought] it will not do for the State simply to say that the circulation of all anonymous handbills must be suppressed in order to identify the distributors of those that may be of an obnoxious character." *Talley*, 362 U.S. at 66 (Harlan, J. concurring). The Court declared that such sweeping laws catch too many not involved in illegal conduct and speech, which here would be too many individuals not involved in child pornography. *See Hill*, 482 U.S. at 464-66. "As the Court observed over a century ago, "[i]t would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained and who should be set at large." *Id.* (quoting *United States v. Reese*, 92 U.S. (2 Otto) 214, 221 (1876)).

The rationale of these cases applies here. Many individuals would unknowingly violate the recordkeeping provisions, particularly private individuals, who have no connection at all to child pornography, the problem the government is attempting to address. If all individuals who produce such photographs understood the obligations of the law, there is no doubt that many would choose to not create the images rather than creating the records, affixing the statements, maintaining the records, and opening their homes to government records inspectors. Indeed, many would choose not to create such images simply to preserve their interest in remaining anonymous.

The line the government has drawn here is very similar to the invalid line drawn in *Watchtower Bible & Tract Society of New York*. The government wanted to prevent fraud and crime perpetrated by individuals engaging in door-to-door visits. The Supreme Court stated that those going door-to-door for the purpose of consummating commercial transactions or soliciting funds could be regulated to prevent fraud and crime, because those two evils were more likely to occur when the individuals had such a purpose for going door-to-door. 536 U.S. at 168. While the individuals with those purposes could be regulated, the interest in preventing fraud and crime did not justify regulating others who had religious, political, or other advocacy purposes for going door-to-door. *Id.*

The government has drawn a similarly over-inclusive line here by including all sexually explicit photographs, whether created for commercial purposes or whether the individual depicted clearly looks older than a given age. While the evil the government seeks to prevent, child pornography, has a chance of being found beyond any carefully drawn line, a broader category is not justified when that chance is too slim. There is a chance of fraud and crime being perpetrated by individuals going door-to-door for religious, political, or other advocacy purposes, but that chance is not large enough to justify burdening all individuals engaging in that sort of speech.

We do not belittle the despicability of child pornography, and we appreciate the difficulties faced by the government. There are a myriad of limitations available, however, that would reduce the breadth of the recordkeeping requirements and would more narrowly focus on the government's interest and therefore remove some of the protected speech from the statute's coverage. Such limitations have been suggested by witnesses who testified before Congress and by the plaintiffs here. "Congress may pass valid laws to protect children from abuse, and it has. The prospect of crime, however, by itself does not justify laws suppressing protected speech." *Free Speech Coal.*, 535 U.S. at 245 (citation omitted).

The Supreme Court's decision in *Free Speech Coalition* reinforces this reasoning. The government cannot "turn[] the First Amendment upside down" by over-burdening protected speech "merely because it resembles [unprotected speech]." *Id.* at 255. Indeed, here the government is burdening speech that, aside from being photographs of sexually explicit conduct, in no way resembles child pornography because the individual depicted may obviously be thirty or forty or fifty or sixty years old. "The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Id.* The recordkeeping requirements of 18 U.S.C. § 2257 are, therefore, facially unconstitutional for overbreadth.

### F. Facial Invalidation

Once a statute is deemed overly broad, the last consideration is the remedy. The remedy could be facial invalidation or, as recognized by the partial dissent, the remedy could be severing the constitutionally problematic portion of the statute. *See Ferber*, 458 U.S. at 769 n.24 ("[I]f the federal statute is not subject to a narrowing construction and is impermissibly overbroad, it nevertheless should not be stricken down on its face; if it is severable, only the unconstitutional portion is to be invalidated."); *see also Denver Area Educ. Telecomms. Consortium, Inc.*, 518 U.S. at 767 (plurality); *United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 370-74 (1971). While we would like to agree with the dissent and save this statute through severing, we do not believe we can and hence hold that the statute is facially invalid.

Severing this statute is not possible under the Supreme Court's caselaw. This case does not present a situation where adding a time period contemplated by Congress would alleviate the constitutional infirmity. *See Thirty-Seven (37) Photographs*, 402 U.S. at 370-74. Nor do we have a case where the parties before us represent the full extent of the overly broad applications of the statute. *See Brockett*, 472 U.S. at 503-05. Nor is this statute one where a particular subsection could be excised, leaving in place the vast majority of Congress's scheme. *See Denver Area Educ. Telecomms. Consortium, Inc.*, 518 U.S. at 767-68 (plurality). Instead, saving this statute requires more extensive editing, and we believe ourselves unable to intrude into Congress's domain in such a manner.

Severing, rather than rewriting, cannot be done in a manner that would adequately address Congress's expressed concerns. The partial dissent's suggested severing shows the difficulty of trying to so edit this statute; the recommended severing would greatly impair the scheme Congress created. For example, it is clear that Congress wanted to regulate publishers because it wanted to stop the repeated publication of images that depict minors. *See, e.g.*, *Ferber*, 458 U.S. at 759 & n.10. If publishers were required to keep records as well, they could not publish photographs of individuals unless they had records reflecting that the individuals are not minors. Under the partial dissent's proposition, however, no publisher, commercial or otherwise, would be covered by the statute. Instead, only those who create the depiction and pay the depicted individuals would have to keep records.

Congress acted when this statute was construed to be as constrained in the manner the partial dissent proposes, and it disapproved. Before the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, tit. V, §§ 501-507, 120 Stat. 587, 623-31 (2006), the statute could be fairly interpreted to have the limited coverage proposed by the partial dissent, but the Department of Justice regulations explained that the coverage was as extensive as the current statute. The Tenth Circuit invalidated the regulations, holding that the statute only covered those who had contact with the depicted performers. *Sundance Assocs., Inc. v. Reno*, 139 F.3d 804, 808 (10th Cir. 1998). Congress responded by amending the statute to cover all the activities, including publishing, that the previous regulations had covered. Senator Hatch stated that the Tenth Circuit's interpretation of the statute was incorrect, and that Congress had all along intended the scope of the statute to be

as extensive as interpreted by the regulations.  *See* 152 Cong. Rec. S7809, S7896 (daily ed. July 19, 2006) (statement of Senator Hatch).

The partial dissent's attempt to constrain the reach of the statute has another consequence of which Congress would disapprove; it only allows for regulation of creators of images who have a commercial relationship with those depicted.  In the Adam Walsh Child Protection and Safety Act of 2006, one of the specific findings Congress made when amending § 2257 was that "[a] substantial interstate market in child pornography exists, including not only a multimillion dollar industry, but also a nationwide network of individuals [who] openly advertising their desire to exploit children and to traffic in child pornography.  Many of these individuals distribute child pornography with the expectation of receiving other child pornography in return."  Pub. L. No. 109-248, tit. V, § 501(1)(B), 120 Stat. 587, 623.  These individuals in underground networks operating via the Internet are unlikely to be paying the children depicted when they create images of them.  Indeed, as we detailed when discussing the proper construction of this statute, there are innumerable situations where the individual is not acting with commercial motives, and is therefore unlikely to either be paying the children depicted or being paid to arrange for the participation of the children. *See supra* p.10-12 (providing examples of surreptitious creation of images as well as creation with the consent of a parent).  While someone could rely on the term "managing" to cover individuals using unpaid performers, we do not believe there is a way to interpret "managing" to cover these noncommercially-motivated people, but not a married couple.

Finally, Congress's interest in aiding prosecutions for production and possession of child pornography would not be well-vindicated by the partial dissent's formulation.  Congress wanted the provenance of all sexually explicit images of children.  An important purpose of these records was to make it easier for prosecutors to prove that the image possessed by a defendant was in fact a child, an element that is required in every prosecution.  Problems proving that the individual depicted is a child are encountered regardless of whether the individual depicted was in some way compensated.

We think that there are many ways Congress can modify this statute to alleviate First Amendment concerns while at the same time ensuring that the statute covers the vast majority of situations with which it is concerned.  Doing so, however, requires greater creativity in formulating and a freer hand in rewriting than we have, a hand which is limited to severing phrases.  This case is very similar to *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995).  The Supreme Court there held that severing was not possible because the potential fixes were not themselves previously adjudicated nor clearly identified from the legislative history, and therefore the severed statute would present difficult constitutional questions that may not be presented if Congress was to draft the legislation.  513 U.S. at 478-79.  Because we have no clear guidance from Congress and the constitutional rules are unclear, we do not believe we can use severing to save the statute's constitutionality while at the same time vindicating Congress's intent.  *See id.* at 479 n.26 ("Drawing a line between a building and sidewalks with which we are intimately familiar, based on settled First Amendment principles, is a relatively simple matter.  In contrast, drawing one or more lines between categories of speech covered by an overly broad statute, when Congress has sent inconsistent signals as to where the new line or lines should be drawn, involves a far more serious invasion of the legislative domain." (citation omitted)); *see also Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329-30 (2006) (unanimous) ("[M]aking distinctions in a murky constitutional context, or where line-drawing is inherently complex, may call for a 'far more serious invasion of the legislative domain' than we ought to undertake." (quoting *National Treasury Employees Union*, 513 U.S. at 479 n.26)).  We therefore find the statute facially invalid.

III. The Fifth Amendment Challenge

The Doe plaintiffs allege that they fear that the identification information required by § 2257 will be used against them in obscenity prosecutions, and that the identification requirements thus violate the Fifth Amendment's right to avoid self-incrimination. Because we have determined that § 2257's universal age-verification requirement runs afoul of the First Amendment, we need not and do not consider the plaintiffs' Fifth Amendment argument.

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment for the government is REVERSED, and the case is REMANDED to the district court with instructions to find 18 U.S.C. § 2257 unconstitutionally overbroad, and accordingly enter summary judgment for the plaintiffs.

---
**CONCURRENCE**
---

KAREN NELSON MOORE, Circuit Judge, concurring.  The Plaintiffs-Appellants have brought both facial and as-applied challenges in this case.  Plaintiffs-Appellants Br. at 32.  The majority opinion decides the case on the grounds of facial overbreadth.  Although I concur in the majority opinion, I write this opinion to make clear that 18 U.S.C. § 2257 would also be found unconstitutional under an as-applied challenge brought by the Plaintiffs-Appellants.

## I.  STANDING

To bring an as-applied challenge, the plaintiffs in this case need to show that they meet the requirements for both constitutional and prudential standing.  Constitutional standing requires a plaintiff to show that he or she "has suffered (1) an injury that is (2) 'fairly traceable to the defendant's allegedly unlawful conduct' and that is (3) 'likely to be redressed by the requested relief.'"  *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 349 (6th Cir. 2007) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  Prudential standing requires a party to assert only its own rights rather than a "generalized grievance" or the rights of third parties.  *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975), and *Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 475 (1982)).  Connection and the publisher of its magazines have definitely asserted a "concrete and particularized" injury caused by § 2257: diminished advertising revenue and circulation.  *Lujan*, 504 U.S. at 560.  This injury, which relates to the specific rights of the plaintiffs, also meets the requirements for prudential standing.  Lastly, Article III's case-or-controversy requirement is met when only one plaintiff establishes standing.  *Mass. v. Envtl. Prot. Agency*, --- U.S. --- , 127 S.Ct. 1438, 1453 (2007).  I therefore do not reach the question of whether the Doe plaintiffs, alone, would have standing.

## II.  ANALYSIS OF CONNECTION'S FIRST AMENDMENT CHALLENGES

### A.  Identifying the Applicable Level of Scrutiny

To determine which level of scrutiny applies, we begin by asking whether the speech restriction in question is content-based or content-neutral.  The Supreme Court faced a similar speech restriction in *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000).  There, the plaintiffs challenged a provision of the Telecommunications Act of 1996 requiring cable operators providing "channels 'primarily dedicated to sexually-oriented programming' either to 'fully scramble or otherwise fully block' those channels or to limit their transmission to" the hours between 10 p.m. and 6 a.m.  *Id.* at 806 (quoting 47 U.S.C. § 561(a) (1994 ed., Supp. III)).  Because the statute "applie[d] only to channels primarily dedicated to 'sexually explicit adult programming or other programming that is indecent,'" the Supreme Court observed that it "'focuse[d] *only* on the content of the speech and the direct impact that speech has on its listeners.'"  *Id.* at 811 (citations omitted).  Accordingly, the Court held that such a restriction represented "the essence of content-based regulation," and thus the Court applied strict scrutiny.  *Id.* at 812-13.

Like the statute at issue in *Playboy Entertainment Group*, the Act involved here applies only to producers of certain types of content, namely, media containing "visual depictions . . . of actual sexually explicit conduct."  18 U.S.C. § 2257(a)(1).  Under the Supreme Court's analysis in *Playboy Entertainment Group*, the Act's restrictions on speech are clearly content-based.

However, the prior panel concluded, in *Connection I*, that the Act is content-neutral and, in *Connection II*, that this conclusion represented the law of the case.  Although I believe that this

conclusion is incorrect,[1] I recognize that it is the law of the case and that we are therefore bound by it. Accordingly, I apply intermediate scrutiny—the level applicable to content-neutral speech regulations—to the Act. *Norton v. Ashcroft*, 298 F.3d 547, 553 (6th Cir. 2002); *cf. City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 440 (2002) (plurality opinion) ("municipal ordinances receive only intermediate scrutiny if they are content neutral").

## B. Applying Intermediate Scrutiny

Under intermediate scrutiny, we must uphold a challenged regulation of speech so long as it is narrowly tailored to serve a significant government interest and leaves open ample alternative channels of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The government bears the burden of proving each part of this test. *Playboy Entm't*, 529 U.S. at 816 ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." (citing *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 183 (1999))).

All agree that preventing the sexual exploitation of minors in child pornography is a significant (indeed, a compelling) government interest. The main thrust of the parties' dispute is over whether the Act's *universal* age-verification requirement is narrowly tailored to this interest.

When courts apply intermediate scrutiny,"the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward*, 491 U.S. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985) (alteration in original)). While the regulation need not be the least restrictive means of promoting the government's asserted interest,[2] *id.* at 798-800, it may not "burden substantially more speech than is necessary to further the government's legitimate interests," *id.* at 799. In other words, if the government "regulate[s] expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals," the regulation is not narrowly tailored. *Id.*

I conclude that the government has failed to establish that the Act does not burden substantially more speech than is necessary to further the government's interest in preventing the sexual exploitation of minors. The alarming breadth of speech burdened by the Act compels this conclusion, especially when compared to the breadth of regulations that directly advance the government's interest in preventing the sexual exploitation of minors in child pornography.

---

[1] I note that in *American Library Association v. Reno*, 33 F.3d 78, 87 (D.C. Cir. 1994), the U.S. Court of Appeals for the D.C. Circuit also concluded that § 2257 is content-neutral. I find this analysis unconvincing. The D.C. Circuit focused on Congress's ultimate intent to deter child pornography by passing § 2257. *Id.* at 86. Focusing on Congress's intentions, however, misses the mark because Congress chose to further its intent via an explicitly content-based speech restriction. If the D.C. Circuit's logic were correct, the Supreme Court would have considered the restriction in *Playboy Entertainment Group* content-neutral because it was aimed not at suppressing the speech in question, but rather at preventing minors' unsupervised access to it. Indeed, Justice Kennedy noted, in the controlling opinion in *City of Los Angeles v. Alameda Books*, 535 U.S. 425 (2002), that "whether a statute is content neutral or content based is something that can be determined on the face of it; *if the statute describes speech by content then it is content based*." *Id.* at 448 (emphasis added). Accordingly, I believe that the D.C. Circuit erred by focusing on Congress's ultimate goal, rather than the means selected to advance it, in determining whether the regulation in question is content-based.

[2] This represents a distinction between the meaning of "narrow tailoring" in the context of strict scrutiny and intermediate scrutiny. Under strict scrutiny, a regulation is not narrowly tailored unless it represents the least restrictive means of achieving the government's (compelling) interest. Under intermediate scrutiny, however, the regulation need not be the least restrictive alternative to be constitutional.

Congress's ultimate goal in passing the Act (as related by the government) was to prevent the sexual exploitation of minors in child pornography. Elsewhere, Congress has chosen to advance these ends directly by passing a flat ban on the production of child pornography. *See* 18 U.S.C. § 2251. It has also chosen to advance these means indirectly by prohibiting the distribution, receipt, and possession of child pornography. *See id.* § 2252; *see also New York v. Ferber*, 458 U.S. 747, 765 (1982) (upholding a similar state statute); *Osborne v. Ohio*, 495 U.S. 103 (1990) (same). These indirect regulations advance the goal of preventing the sexual exploitation of children by destroying the market for materials depicting such activity. *See Osborne*, 495 U.S. at 109. In both the direct and indirect regulations, Congress has chosen to advance its interest in preventing the exploitation of minors by regulating materials depicting the exploitation of minors.

The regulation at issue in this case, § 2257,[3] does not apply only to child pornography. It applies to a class of materials much broader than those depicting what Congress ultimately seeks to prevent, and therefore does not seek to advance Congress's ultimate goal directly, or even as directly as § 2252's prohibitions on distribution, receipt, and possession of child pornography. Instead, Congress seeks to supplement these existing bans by imposing age-verification and record-keeping requirements on *all* visual depictions of actual sexually explicit activity, regardless of the age of the performers. In this regard, the means employed by § 2257 are distinguishable from, and significantly broader than, those employed by §§ 2251 and 2252.

According to the D.C. Circuit, § 2257 advances the interest of preventing the sexual exploitation of minors in three ways. First, it ensures that pornographers will know how old their subjects are and thus prevents producers of pornography from unknowingly exploiting minors. Second, it prevents child pornographers from gaining access to commercial markets by requiring secondary producers to obtain age-verifying documentation from primary producers. If a primary producer fails to provide the necessary information, the secondary producer will not publish the primary producer's materials. Third, it aids enforcement of §§ 2251 and 2252: if a law enforcement officer is uncertain whether a particular depiction of actual sexually explicit conduct contains a minor, he or she will be able to identify the performers and their respective ages. *Am. Library Ass'n v. Reno*, 33 F.3d 78, 86 (D.C. Cir. 1994). Thus, § 2257 does not regulate child pornography directly but is part of a larger regulatory scheme designed to stamp out the production of, and demand for, materials depicting the sexual exploitation of minors. In other words, § 2257 regulates a broad category of protected speech[4] to aid enforcement of a ban on unprotected speech.

The key question is whether the means employed in § 2257—imposing age-verification and record-keeping requirements on *all* who produce depictions of actual sexually explicit conduct, regardless of the performers' ages—burdens substantially more speech than necessary to prevent the sexual exploitation of minors in child pornography. Again, it is notable that § 2257 applies broadly to a category of speech, and that the vast majority of this category (specifically, all that is not obscene and does not involve minors) receives First Amendment protection. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994) ("nonobscene, sexually explicit materials involving persons over the age of 17 are protected by the First Amendment.").

The evidence in the record indicates that the vast majority of swingers are middle-aged and accordingly not at risk of being mistaken for minors. Relatedly, the record contains no indication

_____

[3]In the interest of brevity, I refer to the universal age-verification and record-keeping requirements enforced under § 2257 and its applicable regulations as "§ 2257."

[4]It is debatable whether the target of § 2257 may better be described as "expressive activity," or as "speech." Because § 2257 regulates *visual representations* of particular activity (depictions of actual sexually explicit conduct), rather than the activity itself (actual sexually explicit conduct), I believe § 2257's immediate target is better described as speech.

of swingers engaging in sexual exploitation of minors. Accordingly, in the vast majority of instances, applying § 2257's age-verification and record-keeping requirements to this population does not advance the government's interest in preventing child pornography, but instead operates to burden constitutionally protected speech without any corresponding benefit. Indeed, this is true of all visual depictions of actual sexually explicit activity involving performers who are clearly above the age of majority. Accordingly, a substantial portion of the burden on speech does not serve to advance the government's asserted goal, so § 2257 is not narrowly tailored to the government's interest in preventing the sexual exploitation of minors in child pornography.

The Supreme Court's opinion in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), bolsters this conclusion. There, the Court struck down a statute "extend[ing] the federal prohibition against child pornography to sexually explicit images that appear to depict minors but were produced without using any real children." *Id.* at 239. Key to the Court's conclusion was the fact that the speech at issue "record[ed] no crime and create[d] no victims by its production" and consequently was protected speech. *Id.* at 250. The government nonetheless sought to justify its ban on this protected speech as a means to ban unprotected speech. The Supreme Court noted that such an "analysis turns the First Amendment upside down." *Id.* at 255. I agree. In the majority of instances, § 2257, like the statute at issue in *Free Speech Coalition*, burdens speech that is neither criminal nor unprotected as a means of banning unprotected speech (namely, child pornography). Like the Supreme Court, I conclude that such a regulatory regime is not narrowly drawn, and accordingly would hold that § 2257's universal age-verification requirement is not narrowly tailored to the goal of curbing child pornography.[5]

To illustrate this point, Connection proposes a more-narrowly tailored regulation, modeling its proposal on the regime governing tobacco sales. According to Connection, store clerks are required to ask for identification whenever someone who appears under the age of twenty-six attempts to purchase tobacco products, even though it is legal to purchase such products upon turning eighteen. This regulatory scheme is designed to ensure that people who fall into the age range where they may or may not look old enough to buy tobacco are identified, while people who are clearly of-age are not inconvenienced. I note that the availability of a better tailored regulation does not, by itself, demonstrate that the regulation at issue fails the narrow tailoring test, as intermediate scrutiny does not require that the regulation be the least restrictive means of achieving the government's interest. The point here is that alternatives exist that will burden substantially less protected speech, yet advance the government's asserted interest equally well. And this point illustrates precisely why § 2257 is not narrowly tailored.

This is not to suggest that Congress must employ an analogous regulatory scheme, but rather to illustrate that it is possible to pursue an interest in identifying minors without burdening those who *clearly* are not minors. Additionally, a regulation similar to Connection's proposal appears to tack more closely to Congress's actual goal in passing § 2257. As the D.C. Circuit noted, "The 1988 Act was passed by Congress on the recommendation of the Attorney General's Commission on Pornography." *Am. Library Ass'n*, 33 F.3d at 81. More specifically, the Commission's Recommendation 37 suggested that Congress "enact a statute requiring the producers, retailers or distributors of sexually explicit visual depictions to maintain records containing consent forms and proof of performers' ages." 1 Attorney General's Comm'n on Pornography, Final Report 618 (1986). The Commission recommended such legislation to deal with "pseudo child pornography," which "involve[s] women allegedly over the age of eighteen who are presented in such a way as to make them appear to be children or youths." *Id.* at 618 n.459 (internal quotation marks and citation

---

[5]*Free Speech Coalition*, of course, is distinguishable in that it banned certain protected speech, while § 2257 merely burdens the speech. This distinction, however, is not dispositive. As noted above, the evidence in this case demonstrates that § 2257 places a substantial chill on certain types of expressive conduct and thus has an effect very similar to that of a flat ban.

omitted). According to the Commission, pseudo child pornography created special concerns because it was difficult and sometimes impossible for law-enforcement officials to discern whether the performers were above the age of eighteen or actually *were* minors. The Commission recommended imposing age-verification and record-keeping requirements as a means to ensure that no minors were being exploited in actual child pornography that was passed off as pseudo child pornography. *Id.* at 620. A regulation modeled along the lines that Connection suggests would achieve this goal. Consequently, it is difficult to see why a *universal* age-verification requirement is necessary.

The government objects to Connection's proposal, arguing that some of the pictures submitted do not reveal the performers' faces, which will render extremely difficult the determination of whether the performers depicted appear to be older than twenty-six, or whatever other cut-off age might attach.[6] The government also argues that it is easier to discern a person's age in a face-to-face interaction than in a photograph or video.[7] These arguments, however, are not aimed at the ultimate constitutionality of a universal age-verification requirement. Instead, they are arguments better addressed to a legislature attempting to draft a statute that would survive constitutional muster. It is not our place judicially to revise § 2257 or to tell Congress how to do so. Instead, I merely reiterate that § 2257 burdens substantially more protected speech than is necessary to advance Congress's compelling interest in preventing the sexual exploitation of minors. Accordingly, § 2257 is not narrowly tailored and is, therefore, unconstitutional as applied to the Plaintiffs-Appellants.[8]

### III. CONCLUSION

I remain disgusted by child pornography and the sexual exploitation of children that it depicts and generates, and I remain convinced that protection of children is a government interest of the highest order. Nonetheless, under the applicable precedent, the means that Congress chooses to advance this end must not burden substantially more speech than necessary. For the reasons stated in this opinion, I would conclude that § 2257 is unconstitutional as applied to the Plaintiffs-Appellants. Moreover, I agree with the majority that § 2257 is facially unconstitutional for overbreadth.

---

[6] At oral argument, counsel for Connection suggested that Connection would accept a regime that required performers in sexually explicit depictions who appeared to be under the age of thirty to submit age-identification documents.

[7] The government might also object by arguing that its interest in preventing the sexual exploitation of minors is greater than its interest in preventing teen tobacco use. Such an argument would cut both ways because Connection's readers/advertisers have an even more compelling basis to avoid submitting identifying information than do tobacco purchasers. Rather than merely engaging in a commercial transaction (such as buying cigarettes) that receives no constitutional protection, Connection's patrons seek to engage in *protected speech*. In other contexts, the Supreme Court has highlighted the interest in speaking anonymously. *See, e.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) (striking down a ban on anonymous pamphleteering). Thus, in this case, *both* parties' interests run higher than in the case of tobacco sales.

[8] Because I conclude that § 2257 is not narrowly tailored, I need not address whether it leaves open ample alternative channels of communication. *Parks v. Finan*, 385 F.3d 694, 705-06 (6th Cir. 2004).

---

**CONCURRING IN PART, DISSENTING IN PART**

---

McKEAGUE, Circuit Judge, concurring in part and dissenting in part. I agree with much of the majority's thoughtful opinion. In short, § 2257 is overbroad in its current form. I depart from the majority, however, on the standard we should employ to measure § 2257's breadth and on whether portions of the section can be judicially salvaged. Accordingly, I concur in part and dissent in part.

**I**

My initial point of departure from the majority is with its rejection of the standard for measuring whether a provision like § 2257 is overbroad as set forth in *United States v. O'Brien*, 391 U.S. 367 (1968), *Broadrick v. Oklahoma*, 413 U.S. 601 (1973), and *New York v. Ferber*, 458 U.S. 747 (1982). Maj. op. at 8-9. Section 2257 does not regulate "pure" speech, but rather something closer to the "conduct plus speech" described by the Supreme Court in *Ferber*, 458 U.S. at 771 (discussing *Broadrick*, 413 U.S. at 615). Like regulations covering "picketing and participating in election campaigns," activities which involve both conduct and speech, *id.* at 772, § 2257 on its face concerns itself with the visual depiction (speech) of a specific type of conduct, "actual sexually explicit conduct." It is also clear that the government was not concerned about all "actual sexually explicit conduct," but rather a subset of such conduct—the involvement of adolescents in the pornography industry—and the secondary effects that conduct could have on child pornography in general. *See, e.g.*, Congressional Testimony of H. Robert Showers, Criminal Division, U.S. Department of Justice at 8-9, JA 120-21; Statement of Alan E. Sears, Legal Counsel for Citizens for Decency through Law, Inc. at 18-21, JA 233-35; *see also Am. Library Ass'n v. Reno*, 33 F.3d 78, 85-86 (D.C. Cir. 1994) (discussing findings and recommendations of the Attorney General's Commission on Pornography). For the reasons more fully set forth by the D.C. Circuit in *American Library Association v. Reno*, I would find that: (a) § 2257 regulates aspects of both speech and conduct; and (b) the government had legitimate concerns unrelated to speech in enacting the provision. 33 F.3d at 84-88. Accordingly, I would require that the "overbreadth of [§ 2257] must not only be real, but substantial as well," *Broadrick*, 413 U.S. at 615, and measure it against the standard set forth in *O'Brien*, 391 U.S. at 376. The government should have more room to regulate here than the majority gives it.

**II**

With that said, I agree with the majority that the plain language of the text encompasses expression and conduct far outside the line sufficient to protect minors. Section 2257(a) requires that *all* producers of "visual depictions . . . of actual sexually explicit conduct" create and maintain certain records. As the majority aptly explains, the broad scope of producers defined in § 2257(h) conceivably encompasses adult couples who film or photograph themselves engaging in "actual sexually explicit conduct" or what in an earlier age was more euphemistically known as "marital relations." Excepting the emotional scars that might inure to the couple's child who stumbles across this material, there is little reason to believe that these visual depictions could harm children or contribute in any way to the creation and distribution of child pornography. Thus, I agree with the majority that § 2257 is substantially more broad than necessary to achieve the legitimate ends identified by the government.

Most of § 2257 can, however, be salvaged. As the Supreme Court directed in *Ferber*, a court must not invalidate an entire statute on overbreadth grounds if the statute is severable, in which case only the unconstitutional portion must be invalidated. 458 U.S. at 769 n.24 (citing *United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363 (1971)); *see also Broadrick*, 413 U.S. at 613

(explaining that "any enforcement of [the ordinance] is totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression"). Doing so avoids the dramatic result and "strong medicine" of invalidating the entire statutory scheme. *Ferber*, 458 U.S. at 769.

The broad reach of § 2257 is a function of its definition of "produce." Section 2257(h) provides in relevant part:

> (2) the term "produces"–
>
> > (A) means–
> >
> > > (i) actually filming, videotaping, photographing, creating a picture, digital image, or digitally- or computer-manipulated image of an actual human being;
> > >
> > > (ii) digitizing an image, of a visual depiction of sexually explicit conduct; or, assembling, manufacturing, publishing, duplicating, reproducing, or reissuing a book, magazine, periodical, film, videotape, digital image, or picture, or other matter intended for commercial distribution, that contains a visual depiction of sexually explicit conduct; . . .
> >
> > * * *
> >
> > (B) does not include activities that are limited to–
> >
> > > (i) photo or film processing, including digitization of previously existing visual depictions, as part of a commercial enterprise, with no other commercial interest in the sexually explicit material, printing, and video duplication;
> > >
> > > (ii) distribution;
> > >
> > > (iii) any activity, other than those activities identified in subparagraph (A), that does not involve the hiring, contracting for, managing, or otherwise arranging for the participation of the depicted performers;
> >
> > * * *

Subparagraph (A) sweeps into its reach the typical producers of commercial pornography—photographers, directors, publishers, etc.—but also the unsuspecting adult couple identified by the majority who otherwise has no connection with the industry. In its present form, part (iii) of subparagraph (B) does not except the couple out of the definition because (a) it expressly excludes from the exception those persons who "actually" film or take the visual depiction, and (b) it could be said that one of the participants likely "arrang[ed] for the participation" of the other. Part (iii) can be modified, however, to except people like our couple if it is written as follows:

> > > (iii) any activity, ~~other than those activities identified in subparagraph (A),~~ that does not involve the hiring,

> contracting for, [or] managing~~, or otherwise arranging for~~ the participation of the depicted performers;

Under this construction, the typical industry players would still qualify as producers to the extent that they hire, contract for, or manage the performers. Even those who coerce or physically force someone to perform in a pornographic film, for instance, would still be covered as they likely would receive some consideration for their illicit efforts, and thereby could be said to have contracted for or managed the performer. Who would now fall outside the definition, however, is the member of our paradigmatic couple who it cannot be said either hired, contracted for, or managed in a commercial sense the other member.

The question remains whether Congress would still have passed § 2257 "'had it known' that the remaining 'provision[s were] invalid'?" *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 767 (1996) (plurality) (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 506 (1985)). If so, the court need not invalidate all of § 2257 as overbroad. *Id.* (citing *Ferber*, 458 U.S. at 769).

Section 2257 does not contain an express severability clause; however, the history and purpose of the statute evidence a "'severability' intention" upon which this court could rely. *Id.* (internal quotation marks in original). The "other than those activities" language of § 2257(h)(2)(B)(iii) was not in the original version of the Child Protection and Obscenity Enforcement Act of 1988, Pub. L. No. 100-690, Title VII, § 7513 (the "Act"); Congress added the language in 2006 as part of the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248 (the "Adam Walsh Act"), § 502, partially in response to the Tenth Circuit's decision in *Sundance Associates, Inc. v. Reno*, 139 F.3d 804 (10th Cir. 1998) (striking down Department of Justice regulations similar to the provisions in the amended § 2257).[1] Thus, for most of the period when the statute has been in force, part of the language to be stricken was not included.

More importantly, it is clear that Congress's main purpose with respect to the recordkeeping provisions was to protect adolescents whose ages could not be discerned simply by viewing the visual depiction. In its final report submitted to Congress, the Attorney General's Commission on Pornography found that commercial producers "are looking for models that look as young as possible. They may use an eighteen-year-old model and dress her up to look like she is 15." Final Report at 229-30, JA 249. The more immediate danger, of course, is that a producer will use an *actual* fifteen-year-old and then claim that he or she did not know that the performer was underage. As the Commission explained,

> Despite the umbrella protection provided by the Child Protection Act of 1984, loopholes remain that permit the continued exploitation of children. For example, experts and law enforcement officers have found it difficult to extend this protection because in many instances, ascertaining the real ages of adolescent performers is impossible. By viewing a visual depiction, how does one decide if the performer is fourteen or eighteen, seventeen or twenty-one?

---

[1] The majority points out that Congress made findings in the Adam Walsh Act regarding the electronic exchange of child pornography. Maj. op. at 16. The findings cited by the majority mirror similar comments made to Congress in the 1980s. *See, e.g.*, Final Report at 345, JA 271 ("Investigators have discovered that pedophile offenders use personal computer communications to establish contacts and as sources for the exchange or sale of child pornography."). At that time Congress passed other provisions directly addressing the problem, including adding "computer" to the prohibited means of exchanging child pornography. *See, e.g.*, Act § 7511. The Adam Walsh Act amended not only the recordkeeping provisions of § 2257, but also a host of other provisions, some dealing explicitly with child pornography and exploitation. Thus, I do not find that the congressional finding in 2006 relied upon by the majority adds any support to the thesis that Congress would prefer that the entire recordkeeping provision be stricken.

Final Report at 139, JA 273.  The example cited most often by proponents of the recordkeeping provisions was that of "adult" star Traci Lords who began making hardcore pornographic films at age fifteen. *See, e.g.*, Statement of Sears at 18-19, JA 233-34 (citing the criminal case against the producers of Traci Lords's films, *United States v. Kantor*, 677 F. Supp. 1421 (C.D. Cal. 1987)); Testimony of Showers at 8-9, JA 120-21 (discussing need for recordkeeping provisions in light of the DOJ's then-current prosecution of Traci Lords's producers); Response of Showers to Question by Senator Grassley at 20-21, JA 146 ("Proof that an older-looking adolescent engaging in sexually explicit conduct is actually less than 18 at the time of filming is often impossible."). Because of this problem, the Commission recommended the enactment of age-related recordkeeping provisions, which Congress did in the form of § 2257. Final Report at 138, JA 273.

As noted (but discounted) by the majority, the text of § 2257 and its implementing regulations refer on their face to commercial enterprises. *See* Maj. op. at 5-7 & n.2 (including references to "business premises," "normal business hours," and "commercial distribution"). While other portions of the Act encompass both commercial and noncommercial pornography, the recordkeeping provisions are primarily targeted at the commercial pornography industry. *See, e.g.*, Final Report at 139, JA 273 ("The recordkeeping obligation should be imposed on wholesalers, retailers, distributors, producers and anyone engaged in the sale or trade of sexually explicit material as described in the Child Protection Act."); Response of Showers to Question by Senator Humphrey at 13-15, JA 157 (discussion and rejection of a "commercial purpose limitation" was in reference to § 201 of the Act (dealing with the receipt or possession of obscene matter) and not § 103 (the recordkeeping provisions)); Response of Brent D. Ward, U.S. Attorney, to Question by Senator Hatch at 44-45, JA 157 (explaining that provisions that would aid against "underground child pornography" included § 101 and § 104 of the Act; no mention of § 103); Summary of ACLU Testimony at 2, JA 185 (noting that § 103 would "force all magazine publishers and filmmakers who depict actual sexual activity to keep complex records regarding models"); Statement of Sears at 19, JA 234 (opining that recordkeeping provisions apply only to those who "employ performers"). Because severing the portions of part (iii) indicated above would still capture most, if not all, of the commercial pornography industry within the definition of "produce," § 2257 would continue to combat against adolescent actors being used in the industry.  There is no reason to believe that Congress would have preferred no recordkeeping provisions to the scaled-back version described above.  Thus, I would hold that the invalid provisions are severable from the rest of § 2257. *Denver Area Consurtium*, 518 U.S. at 768.

The majority responds that under my proposition, "no publisher, commercial or otherwise, would be covered by the statute.  Instead, only those who create the depiction and pay the depicted individuals would have to keep records." Maj. op. at 15. It is hard to follow the majority's reasoning here. The definition of "produces" includes "publishing," 18 U.S.C. § 2257(h)(2)(A)(ii), which my suggested severing does not directly affect.  Only if the publisher cannot, in any way, be said to have hired, contracted for, or managed the depicted performers would he fall outside the severed definition of "produces." Yet, such a publisher would not be off the hook under the recordkeeping provisions of § 2257.  Under the relevant portion of subsection (f), "It shall be unlawful–"

\* \* \*

(4) **for any person knowingly to sell or otherwise transfer, or offer for sale or transfer**, any book, magazine, periodical, film, video, or other matter, produce in whole or in part with materials which have been mailed or shipped in interstate or foreign commerce or which is intended for shipment in interstate or foreign commerce, which–

(A) contains one or more visual depictions made after the effective date of this subsection of actual sexually explicit conduct; and

> (B) is produced in whole or in part with materials which have been mailed or shipped in interstate or foreign commerce, or is shipped or transported or is intended for shipment or transportation in interstate or foreign commerce;
>
> which does not have affixed thereto, in a manner prescribed as set forth in subsection (e)(1), a statement describing where the records required by this section may be located, but such person shall have no duty to determined the accuracy of the contents of the statement or the records required to be kept . . . .

(Emphasis added). Thus, even the publisher who is not otherwise a producer would still be compelled to describe in detail where the proper records are maintained.[2] Moreover, to the extent that this publisher is able to so distance himself from the production of the visual images that he would fall outside the severed definition, he would have likely fallen outside of the nonsevered provision of "otherwise arranging for" as well. Thus, severing the unconstitutional portion of § 2257(h)(2)(B)(iii) would not permit a flood of pornography publishers to slip through any cracks of § 2257 that were not there in the first place.

Finally, as to the majority's reliance on the Supreme Court's decision in *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995), the reliance is misplaced. That case was brought by employees of the Executive Branch who challenged the constitutionality of the provision of the Ethics Reform Act of 1989 dealing with honoraria. In an attempt to salvage the provision, the court of appeals had not simply been able to sever the unconstitutional portion from the rest of the act, but actually had to add a provision: ". . . we think it a proper form of severance to strike 'officer or employee' from § 501(b) *except* in so far as those terms encompass members of Congress, officers and employees of Congress, judicial officers and judicial employees." *Id.* at 478 n.24 (quoting lower court decision) (emphasis in original). The government had requested that the Supreme Court craft a different provision, a nexus requirement for the honoraria ban. The Supreme Court rejected both the circuit court's and the government's invitations to craft new provisions, leaving that task to Congress instead. *Id.* at 479. Here, in contrast, we could sever the unconstitutional provision with minimal impact on the rest of the recordkeeping provisions and without having to draft new language.

### III

Consequently, I would find that § 2257, severed as described above, is not overbroad because its reach into protected noncommercial speech would not be so substantial as to render it unconstitutional under *Ferber. See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496-97 (1982) ("[I]t is irrelevant whether the ordinance has an overbroad scope encompassing protected commercial speech of other persons, because the overbreadth doctrine does not apply to commercial speech."). I would likewise reject the remaining First Amendment and Fifth Amendment claims made by the plaintiffs, and would therefore affirm the district court's grant of summary judgment to the government.

---

[2]The Tenth Circuit's 1998 decision in *Sundance Associates*, to which Congress passed portions of the Adam Walsh Act in response, did not address subsection (f), but rather only subsection (h). 139 F.3d at 808-11.